Mark A. CARR, Appellant,

v.

MAIN CARR DEVELOPMENT, LLC, Appellee.

No. 05–10–01346–CV.

Court of Appeals of Texas, Dallas.

March 31, 2011.

Michael C. O'Connor, Stephen P. Rohr, Eric M. Levenhagen, O'Connor, Craig, Gould, Evans & Rohr, Houston, TX, for Appellant.

Leighton Aiken, Dana M. Campbell, Owens, Clary & Aiken, L.L.P., Dallas, TX, for Appellee.

Before Justices MORRIS, MARTIN RICHTER, and FRANCIS.

## OPINION

Opinion By Justice MARTIN RICHTER.

This interlocutory appeal arises from the trial court's denial of a motion to compel a nonsignatory to a contract to arbitrate under the Federal Arbitration Act ("FAA") and from the trial court's denial of a motion to abate. In four issues, appellant Mark Carr contends the trial court erred in denying his motion to compel Main Carr Development, LLC ("MCD") to arbitrate because: MCD is a third-party beneficiary of a contract containing an arbitration clause, MCD is estopped from avoiding arbitration, and MCD is the agent of a party to the contract containing the arbitration clause. Carr also contends the trial court erred in denying his motion to abate because issues in the pending arbitration are likely to resolve material issues in this lawsuit. Concluding appellant's arguments are without merit, we affirm the trial court's orders.

### I. BACKGROUND

MCD is a Delaware series limited liability company organized pursuant to an operating agreement (the "Operating Agreement") executed and effective September 30, 2008. According to the Operating Agreement, MCD is to engage in the development of real estate projects. Specifically, the Operating Agreement authorizes MCD to engage in: (a) development, leasing, and financing Christian Brothers Automotive sites; (b) business activities of a Series;[1] and (c) other activities relating to

---

1. A "Series" is defined in the Operating Agreement as a group of business assets and

or expanding on the foregoing, at the Board's discretion. The Operating Agreement was signed by MCD's four individual members (the "Reed members"), and by Carr in the capacity of manager and trustee of two entities he controls. The Operating Agreement defines "the Company" as MCD and the manager as Main Christian Brothers Development ("MCBD") or a successor entity and the Reed members. The agreement reflects that Carr is a director of MCD, and provides for the establishment and designation of eleven series LLC's to own and lease the projects contemplated by the agreement, subject to Carr's approval.[2] MCD did not sign its own operating agreement. There is no arbitration clause in the Operating Agreement.

On December 18, 2008, Carr, Christian Brothers Automotive Corporation ("CBAC"), a Texas corporation, and MCBD, a Texas limited liability company, entered into a development agreement (the "Development Agreement"). The Development Agreement amends an earlier agreement dated August 31, 2008. MCD is not a signatory to the Development Agreement.

The Development Agreement recites that the parties entered into the agreement "to allow for and enable the identification, development, construction, and leasing of retail store projects" without having to "negotiate key terms each time a new transaction is developed." The Development Agreement provides for the development of projects in one of three ways: exclusively by MCBD, as a joint development between CBAC and MCBD or one of its affiliates, or exclusively by Carr or his designee. Joint developments are to be owned by a Delaware series limited liability company or other entity so as to create a profit ownership split of sixty-five percent to Carr or his designees and thirty-five percent to MBC. The Development Agreement contains an arbitration clause which provides "[i]f the parties are unable to resolve any dispute ... arising from or relating to this Agreement, then the parties hereto agree to submit the dispute to a single arbitrator administered by the American Arbitration Association."

In August 2010, MCD initiated this lawsuit against Carr in the district court and asserted that Carr breached fiduciary duties owed under Delaware law to MCD, its Series, and its members. Carr and CBAC subsequently initiated an arbitration proceeding. The demand for arbitration invoked the arbitration clause in the Development Agreement and named MCD and MCBD as respondents. In addition to the allegations against MCD at issue here, CBAC asserted that MCBD fraudulently induced it to enter into the Development Agreement and that MCBD breached its obligations under the Development Agreement. Carr then moved for the district court to compel MCD to arbitrate and requested abatement of the lawsuit pending the conclusion of arbitration. Following a hearing, the trial judge denied both the motion to compel and the motion to abate. This interlocutory appeal followed.

## II. DISCUSSION

A party may appeal an interlocutory order denying a motion to compel arbitra-

---

related business activities of the Company designated as separate "series." Texas law also allows a series limited liability company. Such a company may establish a designated series of members, managers, membership interests or assets that have separate rights, powers or duties with respect to specified property, obligations, or profits and losses, or that have a separate business or investment purpose. *See* Tex. Bus. & Com.Code Ann. § 101.601 (West 2009).

2. Carr disputes the validity of Exhibit A to the agreement, which is the section that reflects Carr is a director.

tion under the FAA. *See* Tex. Civ. Prac. & Rem.Code Ann. § 51.016 (West Supp. 2010); *In re Merrill Lynch & Co., Inc.,* 315 S.W.3d 888, 891 n. 3 (Tex.2010). In an accelerated appeal of an interlocutory order denying a motion to compel arbitration, we apply an abuse of discretion standard of review. *See Sidley Austin Brown & Wood, LLP v. J.A. Green Development Corp.,* 327 S.W.3d 859, 862–63 (Tex.App.-Dallas 2010, no pet.). Under that standard, "we defer to the trial court's factual determinations if they are supported by evidence, but we review the trial court's legal determinations de novo." *Id.* Whether an arbitration agreement is enforceable is subject to de novo review. *In re Labatt Food Service, L.P.,* 279 S.W.3d 640, 643 (Tex.2009).

■ Both parties agree the FAA governs the arbitration agreement in this case. A party seeking to compel arbitration under the FAA must establish that there is a valid agreement and that the claims fall within the agreement's scope. *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 227 (Tex.2003). The interpretation of an arbitration agreement is generally a matter of state law. *Stolt–Neilsen, S.A. v. Animal Feeds Int'l Corp.,* —— U.S. ——, 130 S.Ct. 1758, 1773, 176 L.Ed.2d 605 (2010). The FAA, however, "imposes certain rules of fundamental importance, including the basic precept that arbitration 'is a matter of consent, not coercion.'" *Id.* (citing *Volt Information Sciences, Inc. v. Bd. Of Trs. Of Leland Stanford Junior Univ.,* 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989)). State law "is applicable to determine which contracts are binding and enforceable [under the FAA] if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." *Arthur Andersen, LLP v. Carlisle,* —— U.S. ——, 129 S.Ct. 1896, 1902, 173

L.Ed.2d 832 (2009); *see also In re Weekley Homes, L.P.,* 180 S.W.3d 127, 130–31 (Tex. 2005) (applying state law to third party beneficiary determination while informed by federal precedent).

■ It is undisputed that MCD did not expressly agree to arbitrate with Carr. The issue we must resolve is whether MCD is bound as a nonsignatory. According to principles of contract and agency law, arbitration agreements may bind nonsignatories under any of six theories: (1) incorporation by reference; (2) assumption; (3) agency; (4) alter ego; (5) equitable estoppel; and (6) third-party beneficiary. *See In re Kellogg Brown & Root, Inc.,* 166 S.W.3d 732, 739 (Tex.2005). Of these theories, Carr asserts MCD must be compelled to arbitrate because it is an agent of MCBD, because it is a third-party beneficiary of the Development Agreement, and because it sought and obtained benefits from the Development Agreement and is therefore estopped from avoiding arbitration. Because Carr did not raise the agency issue in the court below, it has not been preserved for our review. *See* Tex.R.App. P. 33.1; *Gibson v. Ellis,* 126 S.W.3d 324, 330 (Tex.App.-Dallas 2004, no pet.). Therefore, our determination is limited to whether MCD is bound by the arbitration agreement as a third-party beneficiary or under a theory of estoppel.

### Third–Party Beneficiary

■ Courts treat arbitration agreements as other contracts in applying the legal rules to interpret them. *In re Olshan Foundation Repair, Co. LLC,* 328 S.W.3d 883, 889 (Tex.2010). "The goal is to discern the true intentions of the parties, as the FAA's primary purpose is to ensure private agreements to arbitrate and enforce according to their terms, no more, no less." *Id.* A third-party beneficiary to a contract can compel or be compelled to

arbitrate under an arbitration provision in a contract. *See In re NEXT Fin. Group Inc.*, 271 S.W.3d 263, 267 (Tex.2008) (holding employer third-party beneficiary could compel arbitration). Generally, however, "there is a presumption against conferring third-party-beneficiary status on noncontracting parties." *S. Tex. Water Auth. v. Lomas*, 223 S.W.3d 304, 306 (Tex.2007) (citing *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999)). In determining whether a party qualifies as a third-party beneficiary with the ability either to enforce or challenge a contract that was made between other parties, "it is the contracting parties' intent that controls." *Id.* An intent to confer a direct benefit upon a third party must be clearly and fully spelled out or enforcement by the third party must be denied. *Id.* Thus, a third party may only enforce a contract as a third-party beneficiary "when the contracting parties themselves intend to secure some benefit for the third party and entered into the contract directly for the third party's benefit." *S. Tex. Water Auth.*, 223 S.W.3d at 306. "A court will not create a third-party beneficiary contract by implication." *Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex.2002).

■■■ Carr contends the Development Agreement reflects the parties explicitly intended to confer a direct benefit upon MCD. In support of his argument, Carr cites to section 3 of the agreement, which provides:

> [A]ll Joint Developments will be owned **by a Delaware Series Limited Liability Company or other such structure or entity(ies)** reasonably acceptable to Mark Carr (or persons or entities designated by Mark Carr) and MCBD ... It is also anticipated that a buy-sell or similar provision will exist in favor of Mark Carr or his designees to compel MCBD or its affiliate, as the case may be, to purchase Mark Carr's profit interest in a given Joint Development (as **more particularly described in the Operating Agreement of such Delaware Series Limited Liability Company**).... [3]

(Emphasis added). Carr attaches significance to the language referencing ownership of joint developments "by a Delaware Series Limited Liability Company" and insists that this language, coupled with the subsequent reference to a buy-sell provision "more particularly described in the Operating Agreement" clearly refers to MCD. We are not persuaded by this argument. The agreement references "a" Delaware Series Limited Liability Company, not MCD. Moreover, the agreement does not unequivocally provide for ownership by a Delaware Series Limited Liability Company; it expressly contemplates that ownership might also arise in "such other structure and/or entity(ies)" acceptable to Carr and MCBD. The absence of specificity precludes a conclusion that the parties clearly intended the reference to mean MCD.

Carr also relies upon the section limiting third-party beneficiary claims set forth in section 7(c) of the Development Agreement. This section provides:

> *No Third Party Beneficiaries.* Except with regards to the provisions of section 3 above, no claim as a third party beneficiary under this agreement by any person shall be made, or valid, against CBAC or MCBD.

According to Carr, the express carve out for section 3 demonstrates the parties intended to make "the Delaware Series Limited Liability Company" a third-party ben-

**3.** The buy-sell provision in the Operating Agreement relates to certain members' rights to compel the purchase of such members' right, title and interest in a given series.

eficiary. Carr acknowledges MCD is not expressly identified as "the Delaware Series Limited Liability Company," but insists the conclusion is supported by the interrelationship between the Development Agreement and the Operating Agreement. Specifically, Carr maintains that despite the difference in the effective dates of the two agreements, both documents were executed as part of a single transaction or series of transactions.

We disagree with the interpretation Carr seeks to advance. On its face, section 7(c) relates only to the right to assert claims against CBAC or MCBD. No rights are conferred upon MCD. The section expressly precludes third-party beneficiary claims, and the carve out provision does not name MCD. In fact, the language in section 7(c) does not relate to the assertion of any claims other than those which might be asserted pursuant to section 3.

Section 3 of the Development Agreement relates to an anticipated buy-sell or similar provision with respect to Carr's interest in Joint Developments. "Joint Developments" are defined as projects developed jointly between MCBD and CBAC. MCD is neither expressly nor implicitly referenced in section 3. Thus, there is no reasonable basis to conclude either section 7(c) or section 3 pertain to MCD.

■ As further evidence of the allegedly "interrelated" nature of the Development Agreement and the Operating Agreement, Carr relies on two sections of the Operating Agreement that reference the Development Agreement; namely, sections 5.01 and 9.02. The provisions of the Operating Agreement, however, are not relevant to our determination of whether the signatories to the Development Agree-

ment intended the Development Agreement to bestow a benefit on MCD. *See e.g., MCI Telecom. Corp. v. Texas Utilities Elec. Co.*, 995 S.W.2d 647, 651 (Tex.1999) (stating intention of contracting parties controls whether third party can enforce contract). This is particularly true since Carr does not claim MCD should be compelled to arbitrate under an incorporation by reference theory. In fact, Carr acknowledges this theory would not succeed since MCD did not sign the Operating Agreement. In addition, even if the two contracts are "interrelated," it does not necessarily follow that MCD is an intended beneficiary of the contract it did not sign merely because one contract may refer to another.[4] "The fact that a person is directly affected by the parties' conduct, or that he may have a substantial interest in the contract's enforcement, does not make him a third party beneficiary." *Loyd v. ECO Resources, Inc.*, 956 S.W.2d 110, 134 (Tex.App.-Houston [14th Dist.] 1997, no pet.).

■ Finally, Carr relies on the presumption that generally exists in favor of arbitration, and urges its application in this case. But as this Court previously noted, the presumption in favor of arbitration applies to the scope of an arbitration agreement; it does not apply to the existence of such an agreement or to the identity of the parties who may be bound to such an agreement. *See Roe v. Ladymon*, 318 S.W.3d 502, 511 n. 6 (Tex.App.-Dallas 2010, no pet.). Even the exceptionally strong policy favoring arbitration cannot justify requiring litigants to forego a judicial remedy when they have not agreed to do so. *E.E.O.C. v. Waffle House*, 534 U.S. 279, 293–94, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002). Because MCD is not a third-party beneficiary to the Development Agree-

---

**4.** We also note that neither document states that the other is incorporated by reference.

ment, the trial court properly refused to compel MCD to arbitrate pursuant to the arbitration clause in this agreement. Carr's first and third issues are resolved against him.

### Estoppel

■ In his second issue, Carr maintains the trial court erred in refusing to compel MCD to arbitrate because MCD is estopped from avoiding arbitration. According to Carr, MCD's lawsuit is based upon the Development Agreement and MCD sought and obtained benefits from this agreement. MCD responds that Carr's liability arises from obligations imposed under Delaware law, not the Development Agreement. MCD further responds that it did not obtain any benefits under the Development Agreement.

■ Direct benefits estoppel is a type of equitable estoppel first applied in the arbitration context by federal courts and subsequently adopted by our state courts. *See In re Kellogg Brown & Root, Inc.*, 166 S.W.3d at 739. (citing *Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347, 361–62 (5th Cir.2003)). Under direct benefits estoppel, a nonsignatory plaintiff seeking the benefits of a contract is estopped from simultaneously attempting to avoid the contract's burdens, such as the obligation to arbitrate disputes. *See In re Kellogg Brown & Root, Inc.*, 166 S.W.3d at 739. The doctrine recognizes that a party may be estopped from asserting that the lack of his signature precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him. *See Southwest Texas Pathology Assoc., LLP v. Roosth*, 27 S.W.3d 204, 207 (Tex.App.-San Antonio 2000, pet. dism'd). Thus, a nonsignatory plaintiff may be compelled to arbitrate "if it seeks through the claim, to derive a direct benefit from the contract containing the arbitration provision." *Weekley*, 180 S.W.3d at 131. In certain circumstances, a non-signatory may also be compelled to arbitrate if it deliberately seeks and obtains substantial benefits from the contract outside the context of its claim. *See id.* at 132. Carr's argument is premised on both applications of direct benefits estoppel.

Claiming that MCD seeks to derive a benefit from the contract through its claim, Carr argues MCD's breach of fiduciary duty claim sounds in contract rather than in tort. In support of this assertion, Carr relies on language in MCD's first amended petition which states that Carr, in breach of the fiduciary duties he owed as a director of MCD:

> ... embarked on a scheme to purchase, develop, own and/or lease for his pecuniary benefit, and thereby usurp[ed] contracted-for business opportunities from MCD, Christian Brothers Automotive sites in violation of the terms and conditions of the Developer Agreement.

MCD responds that this factual assertion is not made to the exclusion of the fiduciary duties Carr owes MCD, and such duties do not arise from or under the Development Agreement. MCD also argues that the reference to the Development Agreement does not convert the breach of fiduciary duty claim into a breach of contract claim. We review the language Carr relies upon in the context of the entire claim. *See Weekley*, 180 S.W.3d at 131–32. To this end, the amended petition also states that Carr, as a director of MCD:

> ... owed [MCD], its Series and its members ... all of the fiduciary duties that a director owes a company and its equity holders under Delaware law, including, without limitation, the duty of loyalty and utmost good faith, the high-

est duty of candor, the duty to act with integrity of the strictest kind, the duty to restrain from self-dealing and/or the duty of full disclosure.

The amended petition further states that:

In failing to disclose ... the identities of the Usurped Projects ... taking steps to acquire and develop, for his own pecuniary interest ... the Usurped Projects, as well as engaging in the other conduct described above, Carr breached the fiduciary duties he owed to [MCD, its Series, and its members].

The amended petition also alleges that Carr's breaches of fiduciary duty proximately caused damage to MCD. MCD therefore seeks to recover both actual and exemplary damages.

Carr insists MCD's claim cannot be determined independently from the Development Agreement because the substance of the claim is that Carr has deprived MCD of "contracted-for business opportunities" by acquiring and developing Christian Brothers Automotive locations outside the terms of the Development Agreement. Carr also claims MCD's damages cannot be calculated without reference to the Development Agreement because the Development Agreement sets forth fees and other costs included in the cost of development for a project, which in turn is used to calculate rent under the leases. Carr maintains these figures are necessary to determine any alleged loss MCD claims to have suffered as a result of the allegedly usurped projects.

 MCD counters that its claim is not dependant upon the Development Agreement, and even if its breach of fiduciary duty claim somehow "relates" to the Development Agreement, such a relationship is not a sufficient basis to compel arbitration. We agree. A non-signatory cannot be compelled to arbitrate when claims merely "touch matters" covered by a contract or "are dependent upon" a contract; instead, the claims must rely on the terms of the contract. *See Hill v. G.E. Power Sys., Inc.*, 282 F.3d 343, 348–49 (5th Cir.2002); *see also Kellogg*, 166 S.W.3d at 741. MCD's claim against Carr does not rely upon the terms of the Development Agreement. To the contrary, the breach of fiduciary duty claim arises under general obligations imposed by Delaware law and is capable of determination without reference to the Development Agreement. As the *Weekley* court observed, "claims must be brought on the contract (and arbitrated) if liability arises solely from the contract or must be determined by reference to it." *Weekley*, 180 S.W.3d at 132. Conversely, "... claims can be brought in tort (and in court) if liability arises from obligations imposed by law." *Id.; see also In re Vesta Ins. Group, Inc.*, 192 S.W.3d 759, 761 (Tex.2006); *Woodhaven Homes, Inc. v. Alford*, 143 S.W.3d 202, 205–06 (Tex.App.-Dallas 2004, no pet.).

Significantly, to the extent that MCD's breach of fiduciary duty claims might require reference to a contract, it would be the Operating Agreement, not the Development Agreement. The business purpose of MCD is set forth in the Operating Agreement, and MCD's amended petition asserts that the Operating Agreement vested management and control of MCD in the Board of Directors and "[c]onsistent with Delaware law, which controls the terms and Operating Agreement ... Carr, as a director, owed fiduciary obligations to ... MCD, its Series, and [its members]." But the Operating Agreement does not include an arbitration clause.

 The determination of whether a party seeks to benefit from a contract through its claim turns on the substance of the claim, not artful pleading. *See Week-*

*ley*, 180 S.W.3d at 131–32. The substance of the amended petition reflects that MCD does not seek to enforce the Development Agreement in conjunction with its breach of fiduciary duty claim. Its recovery is dependent upon whether it can prove Carr breached his fiduciary duties and caused damage to MCD, its Series, and its members. Carr's assertion that there can be no breach of fiduciary duty claim if he can show he did not violate the Development Agreement is incorrect. The duties Carr owed as a director are distinct from his contractual obligations under the Development Agreement, and MCD need not prove a breach of the Development Agreement to recover on its independent tort claim. In reviewing MCD's claims and the Development Agreement, we are not convinced that MCD "would have no claims had the agreement containing the arbitration provision not been signed." *See ANCO Insurance Svcs. v. Romero*, 27 S.W.3d 1, 6 (Tex.App.-San Antonio 2000, no pet.).

We similarly reject Carr's contention that MCD is estopped to avoid arbitration because it sought and obtained benefits from the Development Agreement by means other than through its lawsuit. This alternative application of direct benefits estoppel does not sweep as broadly as Carr's argument would imply.

■■■ In support of his argument, Carr again relies on the section of the Operating Agreement that references the Development Agreement and claims it establishes "that MCD ... considered that it was an integral part of the Development Agreement and was required to take actions thereunder." Carr also claims that MCD was to take directions from its manager,

defined under the Operating Agreement as MCBD or any successor entity and the Reed members. Carr implies that we should therefore assume MCD received some benefit because MCBD is allegedly an affiliate of MCD, and MCBD signed the Development Agreement. These tenuous connections, however, are immaterial to our inquiry.[5] The focus of our determination is whether MCD sought and obtained a substantial direct benefit from the Development Agreement. *See Weekley*, 180 S.W.3d at 132–133.

We also reject Carr's argument that the Operating Agreement reflects that the business of MCD was exclusively the development, leasing, and financing of Christian Brothers Automotive sites. The express language of the contract states otherwise. In addition to the development, leasing, and financing of Christian Brothers Automotive sites, MCD is also authorized to engage in business activities of a series, and other activities at the Board's discretion. Moreover, the Operating Agreement does not specify or require that Christian Brothers Automotive sites will be developed according to the Development Agreement. And as previously noted, the Operating Agreement is not incorporated into the Development Agreement.

Finally, Carr relies on the testimony of CBAC's chief financial officer that MCD receives lease payments exceeding $50,000 per month. These rent payments are made pursuant to leases, the form of which is attached to the Development Agreement. The lease form, however, does not show that MCD is the landlord of these leases. Instead, it shows that the landlord under the lease agreement is a Series

---

5. In addition, corporate affiliates are generally created to separate the businesses, liabilities, and contracts. Therefore, a contract with one corporation, including a contract to arbitrate, is generally not a contract with any other corporate affiliates. *See In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d 185, 191 (Tex.2007).

LLC. There is also no evidence in the record to establish that MCD is entitled to, or did retain any payments of rent under the leases. The fact that CBAC may forward rent to MCD for distribution to the Series LLC's does not establish that MCD received a substantial direct benefit under the Development Agreement. *See, e.g., In re Golden Peanut Co., LLC,* 269 S.W.3d 302, 311 (Tex.App.-Eastland 2008) (orig. proceeding) (holding fact that estate may ultimately distribute cash to heirs does not convert estate's claim to claim by heirs for purpose of estoppel).

Courts that have applied direct benefits estoppel based on a party's conduct during the life of a contract have required much more than what Carr suggests. For example, using a trade name pursuant to an agreement containing an arbitration clause or receiving lower insurance rates and the ability to sail under the French flag because of a contract containing an arbitration provision bound non-signatories to arbitration. *See Am. Bureau of Shipping v. Tencara Shipyard S.P.A.,* 170 F.3d 349, 353 (2d Cir.1999) (receiving insurance rates and ability to sail under French flag); *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.,* 9 F.3d 1060, 1064 (2d Cir. 1993) (using trade name). Even if MCD received some benefit from the Development Agreement, it is insufficient to satisfy the direct benefits estoppel test. The doctrine does not apply if the benefits are "insubstantial" or "indirect." *Weekley,* 180 S.W.3d at 134.

Therefore, we conclude the tort claim urged by MCD is not encompassed by the arbitration clause in the contract it did not sign. We further conclude MCD did not receive a substantial direct benefit under the Development Agreement. Because Carr's potential liability arises from general obligations imposed by law rather than the Development Agreement, and MCD did not obtain a substantial direct benefit under the Development Agreement, estoppel does not apply to bind MCD to arbitrate its claim. Carr's second issue is overruled.

### Abatement

In his fourth issue, Carr argues the lawsuit must be stayed pending the conclusion of arbitration because the material issue of whether Carr breached the Development Agreement is to be determined in both the lawsuit and in arbitration. In the alternative, Carr asserts that the resolution of whether Carr violated the Development Agreement "is likely to· resolve issues material to this lawsuit." We disagree.

The FAA requires courts to stay litigation of issues that are subject to arbitration. *See* 9 U.S.C.A. § 3 (2009); *In re Merrill Lynch & Co., FSB,* 235 S.W.3d at 195. The Texas Supreme Court has held that "when an issue is pending in both arbitration and litigation ... arbitration 'should be given priority to the extent it is likely to resolve issues material to the lawsuit.'" *In re Merrill Lynch & Co., Inc.,* 315 S.W.3d 888, 891 (Tex.2010) (citing *In re Merrill Lynch Co., FSB,* 235 S.W.3d at 195). But there is no authority to support what Carr suggests—that arbitrable claims must proceed before claims that are not subject to arbitration.

We have concluded MCD's breach of fiduciary duty claim against Carr is not subject to arbitration and does not depend upon whether Carr breached the Development Agreement. The arbitration of whether MCBD fraudulently induced CBAC to enter into the Development Agreement and Carr's and MCBD's performance of their contractual obligations under the· Development Agreement will not resolve the issue of Carr's alleged breach of the fiduciary duties it owed MCD.

Carr also contends failure to stay the litigation will result in "two additional evils." First, he argues it will allow MCD to take discovery and "chip-away" at common issues in the litigation for the benefit of its affiliate MCBD. Next, he maintains that a prior determination in the litigation may result in collateral estoppel. But other than his claim that the two proceedings both involve Carr's alleged breach of the Development Agreement, Carr has not identified the common issues that will lead to the evils he warns against.

Because the breach of fiduciary duty claim is not arbitrable and the disposition of the arbitration will not resolve the issues in this case, the trial court did not err in denying Carr's motion to stay. Carr's fourth issue is overruled. The trial court's orders are affirmed.