

**In the**
**Court of Appeals**
**Second Appellate District of Texas**
**at Fort Worth**

_____

No. 02-20-00033-CV

_____

UNITED HEALTHCARE OF TEXAS, INC.; OPTUM HEALTH CARE SOLUTIONS, LLC D/B/A OPTUM HEALTHCARE SOLUTIONS, INC.; UNITED HEALTHCARE, INC. D/B/A UNITED HEALTHCARE INSURANCE COMPANY; UNITED HEALTHCARE COMMUNITY PLAN OF TEXAS, L.L.C.; EVERCARE OF TEXAS, L.L.C.; UNITED HEALTHCARE BENEFITS OF TEXAS, INC.; UNITED HEALTHCARE SERVICES, INC.; AND UNITEDHEALTH GROUP, INC., Appellants

V.

LOW-T PHYSICIANS SERVICE, P.L.L.C.; LOW-T PHYSICIANS PROFESSIONAL ASSOCIATION; AND LOW-T PHYSICIANS GROUP, P.L.L.C., Appellees

On Appeal from the 342nd District Court
Tarrant County, Texas
Trial Court No. 342-303717-18

Before Sudderth, C.J.; Womack and Wallach, JJ.
Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

This is an appeal from the trial court's denial of the motion to compel arbitration filed by Appellants United Healthcare of Texas, Inc.; Optum Health Care Solutions, LLC d/b/a Optum Healthcare Solutions, Inc.; United Healthcare, Inc. d/b/a United Healthcare Insurance Company; United Healthcare Community Plan of Texas, L.L.C.; Evercare Of Texas, L.L.C.; United Healthcare Benefits of Texas, Inc.; United Healthcare Services, Inc.; and UnitedHealth Group, Inc. (collectively United or Appellants). Appellants are in the business of issuing health insurance policies or processing claims under those policies. Appellees Low-T Physicians Service, P.L.L.C.; Low-T Physicians Professional Association; and Low-T Physicians Group, P.L.L.C. (collectively Appellees or Low-T) are medical service providers who benefit from several medical provider contracts with Appellants in geographically diverse areas across the country. Appellants demanded a large refund from Appellees for alleged overpayments of claims proceeds. Appellees rejected the demand and made a counteroffer which they contend Appellants accepted, forming a settlement agreement that Appellants later breached. Appellees then sued Appellants for declaratory judgment in state court seeking a declaration that the breached settlement should be enforced and declarations of the rights of the parties under the various provider agreements and Texas law regarding processing and payment of claims. Appellants counterclaimed for recovery of the amounts previously demanded as overpayments and sought declaratory relief regarding the rights and duties of the

parties under the provider agreements and applicable law regarding processing and payment of claims. Both sides sought recovery of attorney's fees.

Appellants moved to compel arbitration of all claims by all parties because all the medical provider agreements between the parties had broad arbitration agreements. Appellees contended that each provider agreement—and included arbitration agreement—was a separate agreement for each practice location and that Appellants failed to establish that the claims being asserted in the case fell within the scope of any specific provider agreements. The trial court denied the motion to compel as to all claims.

We affirm in part and reverse and remand in part. We affirm the trial court's denial of arbitration on Appellants' claim for overpayment and on Appellees' claim regarding the alleged breach of the settlement of that overpayment claim, and related costs and attorney's fees (Count One of Appellees' Original Petition and paragraphs 11, 17 and 18 of Appellants' Second Amended Answer and Amended Counterclaim), because Appellants failed to establish that those claims fall within the scope of any arbitration agreement between the parties. We reverse the trial court's denial of arbitration as to both sides' other requests for declaratory relief regarding their rights and duties under the several provider agreements and applicable state laws concerning the payment and processing of claims as well as their related claims for attorney's fees and costs (Counts Two and Three of Appellees' Original Petition and paragraphs 17–19 of Appellant's Second Amended Answer and Counterclaim) and remand this case

3

to the trial court to refer each of those general declaratory relief disputes for arbitration according to the terms of each provider agreement and to also decide whether to stay the nonarbitrable claims pending resolution of arbitration.

## I. Factual Background

Appellant UnitedHealth Group, Inc. is a publicly traded corporation with approximately 185 affiliated entities. Appellant Optum is an affiliate of UnitedHealth Group that processes payments and performs other administrative work on behalf of the UnitedHealth Group entities. The remaining Appellants are also affiliates of UnitedHealth Group that are insurers or administrators of health insurance plans. Appellants (except Optum) sign provider agreements with physicians and group practices to provide healthcare services to Appellants' insureds.

Appellees are three affiliates, each of which is a professional entity employing medical staff who treat patients for hypogonadism, or low testosterone. Physicians associated with Appellees provide medical and wellness services to men at various locations throughout the United States. Low-T's staff provide medical services for the treatment of hypogonadism with testosterone injections. United contracts with medical groups like Appellees (known generally as "preferred providers") to offer medical services to individuals either insured by United or insured by plans administered by United.

Beginning in August 2011, United and Low-T entered into an agreement whereby Low-T became a preferred provider for United. In addition to lengthy

4

portions of the agreement dealing with service and payment responsibilities of the parties, the portions of the agreement pertinent to this dispute provided,

[A.] UnitedHealthcare Insurance Company is entering into this agreement with you. It is doing so on behalf of itself, UnitedHealthcare of Texas, Inc., UnitedHealthcare Beneifts [sic] of Texas, Inc., Evercare of Texas, L.L.C. and its other affiliates for certain products and services we offer our customers, all of which we describe in the attached Appendix 2.

*This agreement applies to you and to your professional staff (the physicians and other professionals who are your employees, or your independent contractors providing services to your patients, and who are subject to credentialing by us) and the services you provide at the locations in the attached Appendix 4.* When this agreement refers to "you", it also refers to your professional staff. Your professional staff is bound to the same requirements of this agreement as you are. You represent to us that you have the authority to bind your professional staff to this agreement.

. . . .

[B.] *This agreement applies to your practice locations identified in Appendix 4.*

. . . .

[C.] What if we do not agree[?]

We will resolve all disputes between us by following the dispute procedures set out in our Administrative Guide. If either of us wishes to pursue the dispute beyond those procedures, they will submit the dispute to binding arbitration in accordance with the *Commercial Dispute Procedures* of the American Arbitration Association [(AAA)] (see http://www.adr.org) within one year.

We both expressly intend that any dispute between us be resolved on an individual basis so that no other dispute with any third party(ies) may be consolidated or joined with our dispute. We both agree that any arbitration ruling by an arbitrator allowing class action arbitration or requiring consolidated arbitration involving any third party(ies) would be contrary to our intent and would require immediate judicial review of such ruling. The arbitrator will not vary the terms of this agreement and will be

bound by governing law. We both acknowledge that this agreement involves interstate commerce, and is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. The arbitrator will not have the authority to award punitive or exemplary damages against either of us, except in connection with a statutory claim that explicitly provides for such relief. *Arbitration will be conducted in Dallas County, TX.*

If a court allows any litigation of a dispute to go forward, we both waive rights to a trial by jury with respect to that litigation, and the judge will be the finder of fact. Any provision of this agreement that is invalid or unenforceable shall not affect the validity or enforceability of the remaining provisions of this agreement or the validity or enforceability of the offending provision in any other situation or in any other jurisdiction. This section of the agreement shall survive and govern any termination of this agreement.

. . . .

[D.]   This is it[.]

This contract, the appendices and the items referenced in the attached Appendix 1, constitute our entire understanding. It replaces any other agreements or understandings with regard to the same subject matter—oral or written—that you have with us or any of our affiliates.

*Federal law and the applicable law of the jurisdiction where you provide health care services govern our agreement. Such laws and the rules and regulations promulgated under them, when they are applicable, control and supersede our agreement.* The Regulatory Appendix referenced in Appendix 1, and any attachment to it, is expressly incorporated to govern our agreement and is binding on both of us. In the event of any inconsistent or contrary language between the Regulatory Appendix (when it applies) and any other part of our agreement, including but not limited to appendices, amendments and exhibits, the Regulatory Appendix will control. [Emphasis added.]

The signatory on the August 2, 2011 agreement is "Low T Center" with an address in Plano, Texas; and Appendix 4 shows provider locations in Indianapolis, Indiana; and Fort Worth, Texas.

Over the next several years, Low-T related entities in Nashville, Tennessee; Southlake, Texas; Conway, Arkansas; Warrenville, Illinois; Arapahoe County, Colorado; Mooresville, North Carolina; Leawood, Kansas; Independence, Missouri; and Knoxville, Tennessee entered into additional preferred provider agreements with UnitedHealthcare Insurance Company and its affiliates. Each agreement specifically stated that it applied to the professionals and their services at each practice location identified in each agreement and that each provider agreement constituted the entire agreement between the parties and their affiliates relevant to the subject matter of the agreement.

While each agreement contained an arbitration clause for resolving "all disputes between us," the clauses varied in their terms. Common to all the agreements was language that if the parties were unable to resolve disputes according to their applicable administrative procedures, they would submit such disputes to binding arbitration. Also common to all the agreements was language to the effect that "any dispute between us [would] be resolved on an individual basis so that no other dispute with any third party(ies)[could] be consolidated or joined with our dispute." Several of the agreements provided that any arbitration ruling that allowed class or consolidated

7

arbitration involving any third parties would be contrary to the terms of the agreement and would require immediate judicial review.

While several of the agreements also provided for arbitration pursuant to the rules of the Commercial Dispute Procedures of the AAA, others were more complex. For example, in three of the agreements, claims under $1,000,000 were to be arbitrated before the AAA using the AAA Healthcare Payor Provider Arbitration Rules while claims for $1,000,000 or more, or for termination of the agreement, required a panel of three arbitrators selected from the AAA's National Healthcare Roster or its National Roster of Arbitrators. Each agreement provided for a different location for arbitration: Dallas County, Texas; Pulaski County, Arkansas; Arapahoe County, Colorado; Cook County, Illinois; Davidson County, Tennessee; Guilford County, North Carolina; and Johnson County, Kansas. None of the agreements addressed handling or arbitration of claims arising outside of each respective agreement.

In December 2017, Optum, on behalf of Appellants, sent Low T Center, LLC a letter demanding that it pay Appellants approximately $2.4 million, which Appellants alleged was the total amount of overpayments for healthcare services provided between May 2014 and May 2017. According to Appellants' discovery response, although United had paid over 40,000 individual health insurance claims to Appellees during that time, the demand had not been based upon an audit of each of those healthcare claims. Instead, Optum contended it had identified coding "errors" totaling

8

less than $10,000.00 during the three-year period from "[a] sample of 11 UnitedHealthcare Employer and Individual records comprising 482 claim lines paid." Optum then "extrapolated" an amount due across a "paid claims universe" to come up with the $2.4 million amount demanded. Nothing in this demand correlated the "claims universe" or the amount claimed to any particular preferred provider agreement between the parties.

Appellees contended that Appellants' audit and demand for repayment violated Texas state law. According to Appellees, Texas law permits an insurer to audit a claim only within 180 days after the claim is received by the insurer. If an insurer follows that and other audit procedures—none of which allegedly permit a broad "extrapolation" of claims—the insurer may demand a repayment only within 180 days after the claim is paid. Except for a relatively small number of claims paid in early 2017, Appellants' demand for repayment of claims dating back to 2014 allegedly violated these requirements. Thus, on December 29, 2017, Appellees sent Appellants a letter disputing Optum's audit and demand. That letter triggered an internal dispute resolution process allegedly required under Texas law.

Appellees used Appellants' internal dispute resolution procedure described in Optum's December 2017 letter to challenge Appellants' right to recoupment. Appellees also retained an independent auditor to review the coding of the healthcare claims. The auditor agreed that the vast majority of claims had been properly coded and that Appellants' repayment demand was not justified. On February 26, 2018,

Appellants sent Appellees' internal counsel a letter stating Appellants had considered Appellees' dispute but had nevertheless determined Appellants' position "remain[ed] valid." Appellants titled the letter "RESOLUTION OF DISPUTE—Overpayment Is Valid" and renewed their demand for payment.

Appellees then sent Appellants a written settlement proposal to resolve the dispute. Accompanying the settlement proposal was a check in the amount of $24,665.21 in proposed satisfaction of the overpayment claim. Appellants cashed the settlement check but then repudiated the settlement on September 12, 2018, stating that the matter was being "referred for litigation" and warning Appellees to be "guided accordingly." Appellants said nothing about arbitration.

In October 2018, Appellees sued Appellants for declaratory relief in the state district court (1) seeking declarations that the overpayment "settlement agreement" was valid and enforceable and that Appellants' audit and demand violated the provider agreements and state law and (2) seeking declaratory relief of the rights and obligations of the parties to "certain provider agreements" without identifying the agreements. One agreement was attached as an exemplar. Appellants answered Low-T's suit and moved to dismiss the case or transfer it to Travis County, Texas. Appellants then reasserted their motion to dismiss or transfer to Travis County but also added counterclaims under unidentified provider agreements that Appellants alleged govern the healthcare claims covered by their demand for overpayment. Appellants also sought declaratory relief regarding the rights and obligations of the

10

parties under the unidentified provider agreements as well as other affirmative relief. Appellants removed the suit to federal court. Appellees moved to remand the case to the state district court, and the federal court granted that motion.

Appellants participated in mediation with Low-T in June 2019. After the mediation proved unsuccessful, Appellants moved to compel arbitration. In doing so, they asked the court to order arbitration "in accordance with the provider agreements that are the subject of this dispute." [Emphasis added.] After Appellants filed their motion to compel arbitration, the parties engaged in limited discovery, with each side producing copies of the provider agreements that are at issue in this case. However, despite being requested to do so, Appellants never identified the underlying healthcare claims made the subject of the repayment demand or correlated them to any specific provider agreement.

The trial court conducted a summary hearing of the Motion to Compel Arbitration and the responses and replies on file and signed an order denying the motion on January 17, 2020. This interlocutory appeal ensued. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.016.

## II. Standard of Review

We review a trial court's order denying a motion to compel arbitration for an abuse of discretion. *Henry v. Cash Biz, LP*, 551 S.W.3d 111, 115 (Tex. 2018), *cert. denied*, 139 S. Ct. 184 (2018); *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 642–43 (Tex. 2009) (orig. proceeding). We defer to the trial court's factual determinations if they are

11

supported by evidence but review its legal determinations de novo. *Henry*, 551 S.W.3d at 115. Whether the claims in dispute fall within the scope of a valid arbitration agreement is reviewed de novo. *Id.*; *Perry Homes v. Cull*, 258 S.W.3d 580, 598 & n.102 (Tex. 2008). The evidentiary standards applicable to Appellants' motion to compel arbitration are the same as those that apply to a motion for summary judgment. *See Doe v. Columbia N. Hills Hosp. Subsidiary, L.P.*, 521 S.W.3d 76, 81 (Tex. App.—Fort Worth 2017, pet. denied). Appellate courts are not required to search a voluminous record with no guidance to identify evidence supporting a claim for arbitration. *See Hall v. Stephenson*, 919 S.W.2d 454, 467 (Tex. App.—Fort Worth 1996, writ denied).

## III. Analysis

### A. The Law

A party seeking to compel arbitration must establish that there is a valid agreement to arbitrate, that the claims raised are within the scope of the agreement, and that the claims are arbitrable; the third element is not an issue here. *Henry*, 551 S.W.3d at 115; *Haddock v. Quinn*, 287 S.W.3d 158, 169 (Tex. App.—Fort Worth 2009, pet. denied). The first question to be answered then is whether there is a valid arbitration agreement between the parties. *G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 525 (Tex. 2015). This step is a question of contract formation: i.e., did the parties have a valid agreement to arbitrate some set of claims? *IQ Prod. Co. v. WD-40 Co.*, 871 F.3d 344, 348 (5th Cir. 2017).

The second issue is whether the claims in question are subject to the arbitration agreement proved. *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 754 (Tex. 2001) (orig. proceeding). Once the party seeking to compel arbitration has established the existence of an enforceable arbitration agreement, both Texas and federal law recognize a strong presumption favoring arbitration. *G.T. Leach Builders*, 458 S.W.3d at 521. However, despite this strong presumption in favor of arbitration, that policy "cannot serve to stretch a contractual clause beyond the scope intended by the parties or allow modification of the plain and unambiguous provisions of an agreement." *Belmont Constructors, Inc. v. Lyondell Petrochemical Co.*, 896 S.W.2d 352, 356 (Tex. App.— Houston [1st Dist.] 1995, no writ); *see also Branch Law Firm, L.L.P. v. Osborn*, 447 S.W.3d 390, 397 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *Osornia v. AmeriMex Motor & Controls, Inc.*, 367 S.W.3d 707, 712 (Tex. App.—Houston [14th Dist.] 2012, no pet.). "Even the exceptionally strong policy favoring arbitration cannot justify requiring litigants to forego a judicial remedy when they have not agreed to do so." *Carr v. Main Carr Dev., LLC*, 337 S.W.3d 489, 496 (Tex. App.—Dallas 2011, pet. denied); *Daniel K. Hagood, P.C. v. Kapai*, No. 05-18-01485-CV, 2019 WL 4010778, at *3 (Tex. App.—Dallas Aug. 26, 2019, pet. denied) (mem. op.). Additionally, even though an arbitration clause might appear to encompass the claims in question,

> the court cannot confine its analysis to the construction of that clause alone. The court must examine the entire agreement. Although the parties broadly may agree to arbitrate in one part of the agreement, they also may place limits on the agreement to arbitrate in another part of the agreement. *Katz v. Feinberg*, 167 F. Supp. 2d 556, 566 (S.D.N.Y. 2001)

13

[*aff'd*, 290 F.3d 95 (2nd Cir. 2002)]; *see J.M. Davidson*[ *Inc. v. Webster*], 128 S.W.3d [223, 229 (Tex. 2003)] (stating that, in construing an agreement to arbitrate contained in a written contract, courts must examine the entire writing in an effort to harmonize and give effect to all the provisions of the contract). In determining whether a given dispute must be arbitrated, a court looks to all terms of the parties' agreement bearing on arbitration. *See J.M. Davidson*, 128 S.W.3d at 229. Even though the wording of an arbitration clause may be broad, its scope may be limited by language elsewhere in the agreement in which the parties unambiguously negate or limit the arbitration clause with respect to a given matter in dispute. *Woodcrest Nursing Home v. Local 144, Hotel, Hosp., Nursing Home [&] Allied Servs. Union*, 788 F.2d 894, 898 (2d Cir. 1986); *Katz*, 167 F. Supp. 2d at 566; s*ee J.M. Davidson*, 128 S.W.3d at 229.

*Branch Law Firm*, 447 S.W.3d at 395.

Arbitration agreements are contracts and are subject to the rules of contract construction. *AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, 131 S. Ct. 1740, 1745 (2011); *IHS Acquisition No. 131, INC. v. Iturralde*, 387 S.W.3d 785, 791 (Tex. App.—El Paso 2012, no pet.) ("An agreement to arbitrate is a contract, the relation[ship] of the parties is contractual, and the rights and liabilities of the parties are controlled by the law of contracts."). As noted by the El Paso court in *Iturralde*,

In construing an arbitration agreement, the court should attempt to give effect to the parties' intentions, in light of the usual and ordinary meaning of the contractual language and the circumstances under which the agreement was made. *See In re Kaplan Higher Educ. Corp.*, 235 S.W.3d 206, 210 (Tex. 2007) ("Arbitration agreements are enforced according to their terms and according to the intentions of the parties.") (internal quotations and citations omitted).

387 S.W.3d at 794. Under traditional contract principles, the primary concern is to ascertain the true intent of the parties as expressed in the instrument. *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex. 1980). Courts should

14

consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Universal C.I.T. Credit Corp. v. Daniel*, 243 S.W.2d 154, 158 (Tex. 1951). No single provision alone will be given controlling effect; all the provisions must be considered with reference to the whole instrument. *Myers v. Gulf Coast Minerals Mgmt. Corp.*, 361 S.W.2d 193, 196 (Tex. 1962). Contracts are construed from a utilitarian standpoint, bearing in mind the particular business activity sought to be served. *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987). In this regard, it has been noted that

> the nature of the parties' relationship is critical. If their sole relationship is established and governed by an agreement with an arbitration provision, their disputes are more likely to fall within the scope of the arbitration provision. But when the relationship extends beyond the agreement or is governed by separate and independent agreements, arbitration is less likely.

*In re Great W. Drilling, LTD*, 211 S.W.3d 828, 838 (Tex. App.—Eastland 2006, orig. proceeding) (footnote omitted), *mand. granted sub nom.*, *In re Gulf Expl., LLC*, 289 S.W.3d 836 (Tex. 2009).

The court may look to extrinsic evidence of the facts and circumstances surrounding a contract's execution to aid in the construction of the contract's language, "but the evidence may only 'give the words of a contract a meaning consistent with that to which they are reasonably susceptible, i.e., to "interpret" contractual terms.'" *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 765 (Tex. 2018) (quoting

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 521 (1995)).

As further explained by the Supreme Court in *URI*,

> [T]he parol evidence rule prohibits extrinsic evidence of subjective intent that alters a contract's terms but "does not prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, the contract text." Thus, extrinsic evidence may be consulted to give meaning to the phrase "the green house on Pecan Street," but "cannot be used to show the parties' motives or intentions apart from" the language employed in the contract.
>
> . . . .
>
> What "facts and circumstances" may be consulted will naturally vary from case to case, but reasonably well-defined contours can be mined from our jurisprudence. Because objective intent controls the inquiry, only circumstantial evidence that is objective in nature may be consulted. We have accordingly described surrounding circumstances as including "'the commercial or other setting in which the contract was negotiated and other *objectively determinable* factors that give a context to the transaction between the parties.'" Setting can be critical to understanding contract language, as we found in cases involving . . . *construction of an arbitration agreement*. We have also cited trade custom as bearing on the parties' objective intent when provisions were stricken from a form insurance contract. Similarly, trade usage can illuminate the meaning of contract language because "the meaning to which a certain term or phrase is most reasonably susceptible is the one which [is] so regularly observed in place, vocation, trade or industry so 'as to justify an expectation that it will be observed with respect to a particular agreement.'" Facts attending the execution may or may not shed light on contract meaning and may or may not cross the parol-evidence line. In deciding what facts and circumstances are informative, rather than transformative, ascertaining objective meaning is the touchstone.

543 S.W.3d at 767–68 (second emphasis added) (footnotes omitted).

## B. Application of Law to Facts

Appellants' arguments can be summarized as follows:

1) Appellees judicially admitted in their petition that their claims must be submitted to arbitration because all the provider agreements contained a broadly worded arbitration agreement.

2) Regardless of whether the parties to every agreement were identical, they were all either affiliates of signatories who were bound to the agreements or were bound under the direct benefits estoppel theory.

3) In response to Appellees' claim that Appellants entered into a settlement of the overpayment claim, any such claims should be submitted to arbitration since the purported settlement arises from the underlying contractual dispute, which is subject to arbitration.

4) To the extent that any claims of any Low-T entities are not subject to arbitration, their claims should be stayed pending conclusion of arbitration of the arbitrable claims.

Appellees deny that they have judicially admitted that their claims should be subject to arbitration. Further, Appellees deny that Appellants met their burden of proving that the claims in question fall within the scope of any arbitration agreement between the parties. Appellees also deny that the direct benefits estoppel theory is applicable and contend that Appellants entered into a settlement and release of the underlying claims and that Appellants' breach of that settlement agreement is not subject to the alleged arbitration agreement.[1]

---

[1]Appellees also contend that Appellants' request to arbitrate is not arbitrable because it was untimely, coming more than one year after the date the dispute arose, in violation of the arbitration provisions in the provider agreements. We need not decide this issue. Whether a party complied with contractual time deadlines for initiation of arbitration is for the arbitrator to decide, not the court. *G.T. Leach Builders*, 458 S.W.3d at 521.

17

Appellees' live pleading was their Plaintiffs' Original Petition for Declaratory Relief. Appellees sought declaratory relief regarding the rights and obligations of the parties under certain Texas statutes, the preferred provider contracts, and the alleged settlement agreement. One provider agreement was attached as Exhibit A as an exemplar. Count One of Appellees' petition sought declaratory relief that the amounts Appellants had claimed to be due from the "paid claims universe" calculated from the smaller, unidentified claims audit had been the subject of a full and final accord and satisfaction. Count Two requested a declaration of the parties' rights under the provider agreements and Texas law:

(a) UHG [(United excluding Optum)] is prohibited from conducting post-payment audits not in conformance with the provisions of the Provider Agreements and Texas law;

(b) UHG is prohibited from making claims for refunds or recoupment from Low T beyond the time limits set by Texas law; and

(c) UHG is prohibited from demanding refunds or making recoupments based on statistical extrapolations beyond the actual claims audited.

Count Three sought declaratory relief regarding the proper methods of coding insurance claims under the provider agreements. Appellees sought attorney's fees for each count and court costs.

Appellants' live pleading was their Second Amended Answer and Amended Counterclaim. In addition to attorney's fees, costs, and interest, Appellants sought a declaration of the parties' rights and obligations under the provider agreements, including their alleged right to recovery of the alleged overpayments, as well as the

18

proper method of recouping such overpayments by allocating them to future claims. Appellants also sought damages for breach of contract for Appellees' failure to refund the overpayments and for Appellees' failure to abide by the dispute resolution provisions of the contracts. Finally, Appellants sought "statutory refunds" under "Chapters 1301 and/or 843."

The first question in the arbitration analysis is whether there is an enforceable arbitration agreement between the parties. The answer is yes, several in fact. All the provider agreements were executed by United Healthcare Insurance Company on behalf of itself and its named and unnamed affiliates. Neither side has contested the "affiliate" relationship of the various United entities nor United Healthcare Insurance Company's authority to enter into the agreements on behalf of the affiliated companies. Therefore, we hold that all Appellants should be treated as parties to each of the provider agreements. As for Appellees, they pleaded that collectively they do business as "Low T Center." Appellees further pleaded that they contract with UHG as a preferred provider, that Appellees are beneficiaries of the UHG preferred provider agreements, and that this lawsuit concerns the payments due under those provider agreements. Appellants therefore established that there are multiple valid and enforceable arbitration agreements, as set forth in each respective provider agreement. *See Hous. First Am. Sav. v. Musick*, 650 S.W.2d 764, 769 (Tex. 1983) (stating assertions of fact in the live pleadings of a party are judicial admissions and are binding on the party making them); *see also FirstMerit Bank*, 52 S.W.3d at 755–56 (holding signatories

19

to contracts with arbitration clauses, and nonsignatories who sue based on such contracts, are bound to the contracts' arbitration clauses); *Powell v. Grijalva*, No. 14-19-00080-CV, 2020 WL 4097274, at \*4 (Tex. App.—Houston [14th Dist.] July 21, 2020, no pet.) (mem. op.); *Gen. Fin. Servs., Inc. v. Practice Place, Inc.*, 897 S.W.2d 516, 521 (Tex. App.—-Fort Worth 1995, no writ) (op. on reh'g). As a result, we need not address the issue of direct benefits estoppel. *See* Tex. R. App. P. 47.1.

The second question we ask in the arbitration analysis is whether the claims in question fall within the scope of the arbitration clauses. We hold that Appellants did not establish that their overpayment claim and Appellees' claim about the alleged settlement thereof (Count One of Appellees' Original Petition and paragraphs 11, 17, and 18 of Appellants' Second Amended Answer and Amended Counterclaim) are within the scope of the arbitration agreements, and we therefore also hold that the trial court did not abuse its discretion in denying arbitration of those matters. However, the other, more general claims for declaratory relief by both sides regarding their mutual rights and obligations under the provider agreements (Counts Two and Three of Appellees' Original Petition and paragraphs 17–19 of Appellants' Second Amended Answer and Counterclaim) are within the scope of the arbitration agreements and should be remanded to the trial court for referral to arbitration under the terms of each respective provider agreement.

The provider agreements all contain language to the effect that all disputes "between us" will be resolved through United's Administrative Guide and, if no

resolution is obtained, through binding arbitration. Appellants contend, and we agree, that this is broad arbitration language. Appellants contend that this language invokes the presumption in favor of arbitration of all disputes between the parties. *See Neal v. Hardee's Food Sys., Inc.*, 918 F.2d 34, 38 (5th Cir. 1990). According to Appellants, since all the agreements contain this language, the overpayment claim should be arbitrated. We find this to be an overly simplistic analysis that fails to implement the intent of the parties. As will be explained below, no provider agreement in the record covers the overpayment demand actually made. Absent an applicable provider agreement, the overpayment demand fails to fall within the scope of any arbitration agreement between the parties.

As with any contract, the court seeks to ascertain and enforce the intent of the parties. The court should look to the wording of the agreement to determine the intent of the parties. *Kaplan Higher Educ. Corp.*, 235 S.W.2d at 210; *Iturralde*, 387 S.W.3d at 794. However, the court should also look to the entire agreement in light of the circumstances surrounding the making of the contract to give meaning to the wording of the agreement. *Universal C.I.T. Credit Corp.*, 243 S.W.2d at 158. Courts construe contracts from a utilitarian standpoint, bearing in mind the particular business activity sought to be served, *Reilly*, 727 S.W.2d at 530, and may consider extrinsic evidence of the facts and circumstances surrounding a contract's execution to aid in the construction of the contract's written language. *URI, Inc.*, 543 S.W.3d at 765.

With these principles in mind, we start by noting that these provider agreements cover two areas of commerce that are heavily regulated at the state level: health insurance claims payments and provision of medical care. Regarding health insurance claims regulations, it has been noted,

> As a result of complaints by aggrieved health care providers and insureds with regard to dilatory practices of some insurers in making payments or reimbursements for health care claims, most states now require insurers to disburse payments in a timely fashion once the claims are deemed clean. Statutes mandating prompt payment are ordinarily found among the general requirements for insurers, provisions addressing accident and health insurance specifically, or material describing unfair and prohibited trade practices. Although prompt-pay requirements also exist for some other lines of insurance, this survey focuses exclusively on those applicable to health insurance.

Thomson Reuters, *Prompt Payment Requirements for Health Insurance Claims*, *50 State Statutory Surveys: Insurance: Health*, 0110 SURVEYS 26, Westlaw (Dec. 2020). Likewise, the practice of medicine is heavily regulated at the state level.[2]

Given this background, the wording of each provider agreement clearly demonstrates that the parties intended to create a decentralized system of separate contracts governing their regional relationships. Each agreement expressly applies only to the identified medical practice, its professional staff, and services provided at that particular practice location. The rationale is obvious; i.e., the services provided at

---

[2]An index of the statutes governing the practice of medicine in the various states can be found at Thomson Reuters, *State Licensure: Physicians, 50 State Statutory Surveys: Health Care: Health Care Providers*, 0100 SURVEYS 24, Westlaw (Sept. 2020). As would be expected, the areas involved in governing the practice of medicine are extensive.

each location, and the billing and payment for those services, were intended to be subject to the state regulatory authority of those practice locations. For example, Texas locations would be governed by Texas law while Tennessee locations would be governed by Tennessee law. Those laws could well be different, and the agreements acknowledge that regulatory reality. In fact, the Regulatory Appendix for each agreement, where attached, reflects the respective state insurance-claim-processing requirements.

Additionally, the fact that the parties executed provider agreements with arbitration clauses with different rules and different arbitration locations clearly demonstrates that the parties viewed each agreement to be an independent contractual document pertaining to the practice locations in that agreement and to the obligations of the parties in each document. Finally, each provider agreement has a clause entitled "This is it," which clearly says that the agreement, along with the appendices, constitutes the entire understanding of the parties, including either side's affiliates, regarding the subject matter of the agreement.

How does the demand for overpayment fit into any of the provider agreements? In short, on this record, it does not. The demand letter did not identify specific billings originating from any identifiable practice location, and Appellants have not established any particular provider agreements to which the claim might apply. Optum allegedly took a limited number of unidentified claims, found what it believed to be a certain rate of improper coding of claims by Low-T, and then applied

that rate to the "audited paid claims universe" to extrapolate a calculated overpayment total. This methodology did not even attempt to correlate the "overpayment" to claims from actual provider agreements. Appellants never showed that they utilized any agreement between the parties to justify this methodology. Appellants simply argue that this is a dispute between the parties and that all disputes between the parties are to be arbitrated. However, this argument fails to recognize that the parties likely have different rights, duties, and remedies depending on which state law and which agreement apply to a claim. By basing their claim on Optum's methodology, Appellants have made it virtually impossible to ascertain which state law and which provider agreement or agreements are applicable to the overpayment claim. There is certainly no evidence of an overarching agreement that authorizes this method of determining claim overpayments across multiple provider agreements that also includes an arbitration agreement to address disputes regarding such calculations. Seeking compelled arbitration of the overpayment claim can best be described as an effort to force a proverbial square peg into a round hole, which we decline to do. We hold that Appellants failed to demonstrate that the overpayment claim falls within the scope of any arbitration agreement. Therefore, the trial court did not abuse its discretion in denying arbitration of the claim for overpayment. We overrule this part of Appellants' first issue.

Appellants contend that because the overpayment claim should be arbitrated, the alleged settlement of the claim should be arbitrated. *Niro v. Fearn Int'l, Inc.*,

24

827 F.2d 173, 175 (7th Cir. 1987); *Valero Energy Corp. v. Teco Pipeline Co.*, 2 S.W.3d 576, 587 (Tex. App.—Houston [14th Dist.] 1999, no pet.). However, since we have held that Appellants did not satisfy their burden to show that the overpayment claim fell within the scope of any arbitration agreement, the trial court did not abuse its discretion in denying arbitration of the alleged settlement of that claim. We overrule this portion of Appellants' first issue.

In their remaining claims, both parties asked the trial court to declare the rights and obligations of the parties regarding various aspects of billing and claims payment procedures under the "provider agreements." These requests clearly fall within the scope of each respective provider agreement and the arbitration provisions governing each agreement. Because we agree that the arbitration language in each provider agreement is broad in scope, an arbitrator may declare the rights and obligations of the parties to the contracts if the contracts do not preclude the arbitrator from awarding such relief. *See 950 Corbindale, L.P. v. Kotts Capital Holdings, Ltd. P'ship*, 316 S.W.3d 191, 196–97 (Tex. App.—Houston [14th Dist.] 2010, no pet.). These contracts do not contain any such prohibition; therefore, these declaratory-judgment claims of the parties should be referred for arbitration according to the terms of each agreement. The trial court's refusal to do so was an abuse of discretion. *See id.* at 197. We sustain this remaining portion of Appellants' first issue.[3]

---

[3]In their second alternative issue, Appellants contend that this court should order that any claims not subject to arbitration be stayed pending the outcome of

## IV. Conclusion

Having overruled Appellants' first issue in part and having sustained it in part, we affirm the trial court's order in part and reverse it in part. That portion of the order denying arbitration on Appellants' claims for alleged overpayment and Appellees' claim of settlement of the overpayment (Count One of Appellees' Original Petition and paragraphs 11, 17, and 18 of Appellants' Second Amended Answer and Amended Counterclaim) and related attorney's fees and costs is affirmed.

However, that portion of the order denying arbitration on all parties' other, general claims for declaratory relief of the parties' rights and obligations under the provider agreements and applicable state law, attorney fees, and costs (Counts Two and Three of Appellees' Original Petition and paragraphs 17–19 of Appellants' Second Amended Answer and Counterclaim) is reversed. We remand this case to the trial court (1) to refer those claims for declaratory relief to arbitration pursuant to the terms of each provider agreement[4] and (2) to address whether to stay claims not subject to arbitration pending the arbitration.

---

arbitration. This issue was not addressed by the trial court. In light of this court's rulings herein, we believe that this matter should be addressed by the trial court on remand. *See Bonded Builders Home Warranty Ass'n of Tex., Inc. v. Smith*, 488 S.W.3d 468, 485 n.7 (Tex. App.—Dallas 2016, no pet.); *see also* Tex. R. App. P. 47.1.

[4]Appellees contend that Appellants asked for arbitration of all claims in Dallas, Texas, under one agreement, the exemplar attached to the Original Petition. This is incorrect. Appellants' Motion to Compel Arbitration sought an order "compelling Plaintiffs to proceed to arbitration in accordance with the provider *agreements* that are the subject of this dispute." [Emphasis added.]

/s/ Mike Wallach
Mike Wallach
Justice

Delivered: January 21, 2021