# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Melissa Dixon and Willard Dixon, Respondents,

v.

Lansing Pattee, Stephanie Pattee, Weekley Homes, L.P., d/b/a David Weekley Homes, John Doe, A2Z Advanced Home Inspections, LLC, Fidelity and Deposit Company of Maryland, Westchester Fire Insurance Company, and Gutter Pros, LLC, Defendants,

And

Lansing Pattee and Stephanie Pattee, Third-Party Plaintiffs,

v.

Gutter Pros, LLC, Third-Party Defendant,

Of whom Weekley Homes, L.P., d/b/a David Weekley Homes is the Appellant,

And

Lansing Pattee and Stephanie Pattee are the Respondents.

Appellate Case No. 2020-000384

———————————

Appeal From Dorchester County
Edgar W. Dickson, Circuit Court Judge

———————————

Opinion No. 6040
Heard June 5, 2023 – Filed December 20, 2023

**REVERSED**

Jennifer Sue Ivey and John Phillips Linton, Jr., both of Walker Gressette & Linton, LLC, of Charleston, for Appellant.

Steven L. Smith and Zachary James Closser, both of Smith Closser, and William King Kalivas, all of Charleston, for Respondents Lansing Pattee and Stephanie Pattee.

Gregory L. Hyland, of Walterboro, for Respondents Melissa Dixon and Willard Dixon.

**KONDUROS, J.:**  This case arises out of Melissa Dixon and Willard Dixon's (the Dixons') lawsuit alleging the home they purchased from Lansing Pattee and Stephanie Pattee (the Pattees) was defective.  Weekley Homes, LLC, f/k/a Weekley Homes, L.P. d/b/a David Weekley Homes (Weekley) constructed the home.  Weekley appeals the circuit court's denial of its motion to compel arbitration.  It contends the Pattees' purchase agreement with it (the Agreement) involved interstate commerce, which the Agreement explicitly stated, and provided the Federal Arbitration Act (FAA) would apply.  We reverse.

## FACTS/PROCEDURAL HISTORY

The Pattees entered into the Agreement with Weekley on August 18, 2008, to purchase the subject property in Summerville and the "residential improvements constructed, or to be constructed, thereon."  Weekley built the home sometime in 2007 and/or 2008, although the parties do not agree exactly when it was completed.  Changes and customizations of the home were made pursuant to the Agreement.  The sale closed on September 10, 2008.  The Agreement specified that the closing was to be completed within five days of Weekley's completion of its "construction obligations."

Regarding construction of the home, the Agreement provided:

**5[.]  CONSTRUCTION OBLIGATIONS:** Seller's construction obligations shall be deemed completed upon the earlier of: (a) when it has completed construction of the dwelling in substantial conformity with the Plan referred to herein; or (b) upon final approval by any applicable governmental authority; or (c) upon final inspection in accordance with the Home Warranty program offered by Seller.  **There is no guaranteed date of completion and Seller shall have no liability for failure to complete the dwelling by a certain date or within a reasonable period of time. Any statement of construction time is only an estimate.**  Construction of the improvements may be subject to changes in plans, specifications, materials, fixtures and methods; . . . By closing, Purchaser accepts the Residence as constructed, except for repairs required under the terms of the Home Warranty.

The Agreement also provided:

**6[.] DECORATOR SELECTIONS, CUSTOM CHOICES, AND CHANGE REQUESTS:** Seller may allow Purchaser to select some interior decorating items,[1] such as floor coverings and color of appliances ("Decorator Selections" and/or "Custom Choices"), or make other minimal modifications to the Interior of the Property ("Change Requests"), if selected and deposits paid within fourteen (14) days of the Write-Up Date of this Agreement.  Any selections made after this deadline may be subject to a change order fee.  Decorator Selections may be made only from Seller's designated catalogs or other approved selection lists or samples.

Under the section entitled Notices and General Provisions, the Agreement states:

---

[1] A checklist accompanying the Agreement suggests the Pattees had been able to select between options for flooring, appliance color, bath hardware, countertops, plumbing fixtures, shower enclosures, interior and exterior hardware, lighting style, interior paint, and backsplash and wall tile.

**12[.] ADDITIONAL PROVISIONS:** <u>Sellers to continue hardwoods through Family Room (to door of Owners Retreat), Kitchen, and Breakfast Rooms.  Sellers to replace laminate kitchen countertops, sink, and faucet with a first level Quartz countertop (customer's choice), 2 Bowl undermount Stainless Sink and Stainless Faucet. Sellers to continue crown molding through Study and Family Room.</u>

Regarding arbitration of disputes, page 4 of the Agreement states:

**9[.]  DISPUTE RESOLUTION: ANY CLAIM, DISPUTE OR CAUSE OF ACTION INVOLVING SELLER OR PURCHASER (INCLUDING ANY CLAIM OR CAUSE OF ACTION BROUGHT BY EITHER PARTY AGAINST SUBCONTRACTORS, SUPPLIERS, MANUFACTURERS, AFFILIATED COMPANIES, THE DEVELOPER OF THE PROPERTY, OR ANY OTHER PROVIDER OF GOODS OR SERVICES IN CONNECTION WITH THE PROPERTY OR THIS AGREEMENT), SHALL BE RESOLVED BY BINDING ARBITRATION, IN ACCORDANCE WITH THE FEDERAL ARBITRATION ACT (TITLE 9, U.S. CODE) OR THE APPLICABLE STATE ARBITRATION STATUTE, IF THE FEDERAL ARBITRATION ACT DOES NOT APPLY.**

**a[.] <u>Scope of Arbitration</u>.  The Arbitration provisions of this Agreement apply to all claims brought by through or under Purchaser, their dependents or other occupants of the Property, whether sounding in contract, tort, or otherwise, including claims for emergency or interim relief.  The claims, disputes or causes of action within the scope of arbitration include, but are not limited to, those arising in connection with: (i) this Agreement, including the negotiation, formation, subject matter, breach, cancellation or termination hereof; (ii) the**

development, design, construction, preparation, maintenance or repair, of improvements to the Property; (iii) marketing or sale of the Property; (iv) any representations or warranties, express or implied, relating to the Agreement or the Property; (v) any transaction, event or relationship between Purchaser and Seller, including any subsequent agreement or alleged agreement between Purchaser and Seller; (vi) any violations of any statute including, but not limited to, consumer protection, disclosure, or similar statutes or regulations (vii) any personal injury or property damage claim; and/or (viii) any other agreement, transaction, occurrence or event giving rise to a dispute over breach of legal duties, rights or obligations which involve Purchaser and Seller ("the Dispute").  This arbitration provision shall survive closing, breach or termination of this Agreement and shall not be superseded by the doctrines of merger or waiver.

. . . .

c[.] __Administration of Mediation and Arbitration__.  If the Dispute arises in connection with an alleged construction defect the arbitration may be initiated and administered in accordance with the provisions of the Home Warranty instead of this Agreement.

     . . . .

f[.]  __Limitations__. ANY CLAIM, DISPUTE OR CAUSE OF ACTION BETWEEN PURCHASER AND SELLER MUST BE BROUGHT BY PURCHASER NO LATER THAN TWO (2) YEARS AFTER THE DATE THE CAUSE OF ACTION ACCRUES, unless applicable law requires application of a different period of limitations (i.e., prevents a contractual two-year limitations period). Unless proven otherwise, it shall be presumed that any such cause of action accrued on the Closing Date;

**or, if no closing occurs, on the Acceptance Date. Any longer periods of limitations are hereby expressly WAIVED by the parties. An unsuccessful motion or action to stay an arbitration proceeding based on the position that It has been commenced after expiration of limitations shall not waive any party's right to have the underlying dispute resolved by arbitration.**

Each page of the Agreement contains the purchasers' signed initials.

Additionally, the Pattees signed a Homeowner Portfolio Receipt, which states, they received a sample of the Home Warranty ("Warranty") administered by Professional Warranty Service Corporation (PWC).[2] At the bottom of the front page of the Warranty it states, "**THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION, WHICH MAY BE ENFORCED BY EITHER PARTY**." On the second page it states:

> THIS **LIMITED WARRANTY** PROVIDES: THAT ANY AND ALL CLAIMS AND DISPUTES BETWEEN **YOU** AND **US** WHICH **YOU** AND **WE** ARE UNABLE TO RESOLVE BY MUTUAL AGREEMENT, SHALL BE RESOLVED SOLELY AND EXCLUSIVELY THROUGH FINAL AND BINDING ARBITRATION IN ACCORDANCE WITH THE TERMS AND PROCESS DESCRIBED WITHIN THIS DOCUMENT. BY THIS AGREEMENT, BOTH **YOU** AND **WE** ARE WAIVING THE RIGHT TO LITIGATE DISPUTES IN COURT.

The Warranty disclaimed any express or implied warranties to the extent permitted by law and excluded from recovery consequential or incidental damages resulting from construction defect. Consequential and incidental damages were defined as injury *other than*, the cost to correct a construction defect, repair or replace personal property damaged by the construction defect, and the cost for reasonable alternative housing necessitated by any construction defect or its repair.

The Warranty further stated:

---

[2] The Warranty included in the record on appeal is an unsigned "Sample Warranty."

> This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by and interpreted under the Federal Arbitration Act now in effect and as it may be hereafter amended (the "FAA") to the exclusion of any inconsistent state law, regulation or judicial decision. The award of the arbitrator shall be final and binding and may be entered as a judgment in any court of competent jurisdiction.

The Warranty also indicated it was "separate and independent" of the Agreement and any unenforceable provision on the Warranty were severable from the rest of the provisions therein. It also contained a provision regarding subsequent homeowners.

## B. Transfer to Subsequent HOMEOWNERS

> This **LIMITED WARRANTY**, subject to all of its terms and conditions, including but not limited to, its mandatory binding arbitration provision, will transfer to new owners of the **HOME** for the remainder of the **WARRANTY PERIOD**. **YOU** agree to provide this **LIMITED WARRANTY** to any subsequent purchaser of the **HOME** as a part of the contract of sale of the **HOME**. Please see the form "SUBSEQUENT HOME BUYER ACKNOWLEDGEMENT AND TRANSFER"[3] contained at the end of this document.

The Pattees sold the residence to the Dixons on February 28, 2017. On August 30, 2017, the Dixons filed a complaint against the Pattees, alleging the Pattees sold them a home with certain defects, including moisture intrusion issues, and the Pattees knew of the issues but did not reveal the defects to the Dixons prior to the conveyance. The Dixons alleged causes of action against the Pattees for breach of

---

[3] This provided transfer form includes the statement: "**I/we acknowledge and agree to the Binding Arbitration Procedure contained in the HOME BUILDER'S LIMITED WARRANTY.**" The form has instructions for mailing it in to PWC.

contract, fraud, fraud in the inducement, negligent misrepresentation, and violation of the South Carolina Residential Property Conditions Disclosure Act.

On July 18, 2018, the Dixons filed an amended complaint, maintaining their claims against the Pattees, but also adding claims against Weekley; A2Z Advanced Home Inspections, LLC (A2Z); and John Doe, as unknown construction agents.  The Dixons asserted that during 2007 and 2008 Weekley obtained the necessary permits to construct a home, built the home, and subsequently sold the home to the Pattees.  They asserted the home was constructed in a defective condition.  The amended complaint asserted three causes of action against Weekley: (1) negligence and gross negligence; (2) breach of express and implied warranties; and (3) violation of the South Carolina Unfair Trade Practice Act (SCUTPA).  As to the cause of action for breach of warranties, the Dixons stated:

> These Defendants impliedly and/or expressly warranted that the design, building, construction, and materials would be performed using the utmost skill and attention and would be of good and workmanlike quality.  Further, these Defendants impliedly and/or expressly warranted that the design, building, construction, and materials would be such that the Subject Property would be habitable and fit for its intended use as a single family residence.
>
> . . . These Defendants have breached said warranties by designing, developing, manufacturing, constructing, distributing, selling and/or repairing Subject Property and/or the manufactured components installed into and/or onto said residence in such manner as to be in violation of applicable building codes, standard building practices, relevant product specifications, accepted building component manufacturing standards and accepted construction industry standards and practices.

On August 16, 2018, the Pattees answered the Dixons' amended complaint, denying the allegations, raising multiple defenses, and cross-claiming against Weekley seeking equitable indemnification.  Weekley answered the Dixons' amended complaint on August 24, 2018, raising numerous defenses and asserting that the Dixons' claims should be resolved by arbitration.  On September 11, 2018,

Weekley also filed an answer to the crossclaims for equitable indemnification asserted by the Pattees.

On November 21, 2018, Weekley filed a motion to compel arbitration for all claims asserted against it, stating, "The factual allegations offered in support of each of the causes of action further demonstrate that the claims arise out of or relate to the home, the warranty, and/or the contract. Consequently, all claims in this case are within the scope of the arbitration provision." Weekley filed an affidavit from John Burchfield, General Counsel for Weekley, in support, stating that "[b]ecause [the Agreement] included the construction of the home and allowed the Pattees to make certain decisions customizing that construction, the contract implicates interstate commerce." He further provided, "The contract includes a mandatory binding arbitration provision providing for the arbitration of all disputes including but not limited to disputes arising out of the contract; the development, design or construction of the property; the marketing or sale of the property; any warranties, express or implied, relating to the property." The records submitted by Burchfield as exhibits to his affidavit show that the Pattees made $15,275 worth of customizations.

On January 1, 2019, the Dixons amended their complaint again. The Dixons' second amended complaint added allegations against two surety companies that allegedly issued license bonds to Weekley and a negligence cause of action against Gutter Pros, LLC. The second amended complaint asserted two causes of action against Weekley: (l) breach of express and implied warranties and (2) an unfair trade practices cause of action. This complaint did not assert negligence and gross negligence claims against Weekley, unlike the first amended complaint, although it did raise negligence claims against other parties.

On January 16, 2019, Weekley answered the Dixons' second amended complaint asserting arbitration as a defense and incorporating its pending motion to compel arbitration. On January 21, 2019, the Pattees answered the Dixons' second amended complaint and asserted the same equitable indemnification cross-claims against Weekley as they had in a prior responsive pleading. On February 1, 2019, Weekley filed an answer in response to the Pattees' crossclaims.

On February 11, 2019, Weekley filed a memorandum of law in support of its motion to compel arbitration. It maintained the Dixons' two claims against them, breach of warranty and violation of the SCUTPA, fell within the arbitration provisions of the Agreement and, "[t]o the extent the [Dixons] argue the arbitration provision cannot be enforced against them because they are non-signatories to the

agreement to arbitrate, that argument fails" because they "have sued Weekley for breach of the express warranty issued to the Pattees, which included the provision for mandatory arbitration." It also argued the Pattees' cross-claim against it for equitable indemnification fell within the broad mandatory arbitration provisions because the Dixons' claims against the Pattees arise from the construction of the home.

On February 12, 2019, the circuit court held a hearing on several matters including the motion to compel arbitration. At the hearing, the Dixons and Pattees argued the Burchfield affidavit was insufficient to demonstrate the transaction involved interstate commerce as he did not have personal knowledge of the transaction. The Dixons also argued they had not alleged a breach of contract claim against Weekley, instead they alleged "negligence, gross negligence, breach of the implied and/or expressed warranties, [and] merchantability, you know, workmanlike manner" and also an Unfair Trade Practices Act claim." As relates to the actual construction of the home, the Dixons asserted although the Agreement was signed on August 18, 2008, "permits were pulled for this property in 2007" and "only last up to one year unless renewed." They closed on their property September 10th of 2008, "approximately 20 days later, which certainly did not leave room to build a home . . . ." The Dixons argued "we're dealing with a contract for the sale of real estate, not for construction, not for custom elements." They argued *Bradley v. Brentwood Homes*[4] stated a purchase sale agreement was an intrastate transaction, not an interstate transaction, therefore did not involve federal preemption by the FAA. The Dixons contended that because the FAA did not apply, the agreement should be examined under the South Carolina Uniform Arbitration Act (SCUAA) and the agreement here did not meet the requirements of it.

The Dixons also argued they "were not signatories to this purported agreement." They asserted the separate document warranty, "which it's been represented as accepted by the Pattees, is a sample document that has not been signed by anyone." They stated they "don't base any claim on warranty because, chances are, based on a—common knowledge and experience, that an expressed warranty concerning the issues that we're dealing with in this case would [have] expired anyway if we even had that as, as of the—any sort of basis for asserting a claim."[5]

---

[4] *Bradley v. Brentwood Homes, Inc.*, 398 S.C. 447, 730 S.E.2d 312 (2012).

[5] The Dixons also argued the agreement was barred from being enforced by the Statute of Frauds. However, they did not plead the statute of frauds. *See Shirey v. Bishop*, 431 S.C. 412, 424, 848 S.E.2d 325, 331 (Ct. App. 2020) ("[T]he party seeking the protection of the statute of frauds *must* plead it." (emphasis added by

The Pattees argued the Agreement which contained the arbitration provision did not involve construction of the home. In further attacking Burchfield's affidavit, the Pattees asserted the affidavit did not "go through the choices they actually [made] and say where those materials came from." The Pattees additionally argued that the Agreement was an adhesion contract and the arbitration provision was unconscionable towards them. They asserted *D.R. Horton*[6] was on point with respect to the arbitration provision.

Weekley argued the Dixons' assertion that this was a complaint for negligence against Weekley was untrue because the complaint stated which party each cause of action was against and the only two causes of action in the second amended complaint against Weekley were breach of warranty and unfair trade practices. It argued the Dixons' contention that they were not trying to sue under the Agreement or Warranty was belied by the language in their complaint which alleged "Weekley impliedly and/or expressly warranted" to do certain things. Weekley argued that this was a "*[Bradley v. ]Brentwood Homes* issue": "Is it just the simple sale of a piece of property . . . or does this contract include elements of construction." It contended Burchfield's affidavit provided that because the contract involved the customization of the house, it was more than a purchase agreement. It argued the contract itself also supported that contention; Paragraph 5 entitled "construction obligations" was about half a page and provided "construction of the improvements may be subject to changes in plans, specifications, materials, fixtures, methods." It stated "the next paragraph include[d] custom choices and change order requests." It asserted "this contract is more than just the sale of a piece of property because, by its very terms, it includes things other than that. "It also pointed to footnote 8 of *Brentwood Homes* in which the court provided that if the contract had involved the construction of a house, the court would have compelled arbitration under the FAA because construction contracts implicate interstate commerce. The circuit court stated it would take the matter under consideration.

Following the hearing, Weekley filed an affidavit of Tim Dupree in further support of its motion to compel arbitration. Dupree attested that the following specific materials were purchased for the Pattees' home from manufacturers or suppliers outside of South Carolina: appliances: Kentucky; roofing shingles: Minnesota; hardwood flooring: North Carolina; countertops: Minnesota; sinks purchased:

court) (quoting *Am. Wholesale Corp. v. Mauldin*, 128 S.C. 241, 243, 122 S.E. 576, 576 (1924))).

[6] *Smith v. D.R. Horton, Inc.*, 417 S.C. 42, 790 S.E.2d 1 (2016).

California; faucets: North Carolina; and crown molding: Georgia. Dupree further attested that those materials were transported from outside of South Carolina to the property.

On October 9, 2019, the circuit court denied the motion to compel arbitration in a Form 4 order with no findings, along with other matters, stating: "After careful consideration, the Court respectfully denies the motion to compel arbitration, the motion to dismiss, and the motion for summary judgment. The court finds that there is sufficient evidence based upon the pleadings, discovery, motions, to withstand the motion for summary judgment and continue with the case."

On October 14, 2019, Weekley filed a motion to reconsider, alter, or amend the order. On February 10, 2020, the circuit court held a hearing on Weekley's motion. At the outset of the hearing, the court stated "what I normally do is . . . I decide whether or not I'm going to hear it again. Okay? And I did not decide to hear it again. Okay?" No actual arguments on the motion were made at the hearing and the circuit court issued an order stating "I have reviewed and considered the Motion to Reconsider and all supporting documents, affidavits and memoranda on file and, after due consideration find and conclude that the Court's previous ruling should stand undisturbed." This appeal followed.[7]

**STANDARD OF REVIEW**

Unless the parties otherwise provide, the question of the arbitrability of a claim is an issue for judicial determination. *Zabinski v. Bright Acres Assocs.*, 346 S.C. 580, 596, 553 S.E.2d 110, 118 (2001). Determinations of arbitrability are subject to de novo review, but if any evidence reasonably supports the circuit court's factual

---

[7] The Dixons and the Pattees are all Respondents. However, only the Dixons filed a Respondent's brief. Rule 208(a)(4), SCACR, provides in part: "Upon the failure of respondent to timely file a brief, the appellate court may take such action as it deems proper." Such action may include reversal. *See Turner v. Santee Cement Carriers, Inc.*, 277 S .C. 91, 96, 282 S.E.2d 858, 860 (1981) (noting the respondent's failure to file a brief alone would justify reversal); *Robinson v. Hassiotis*, 364 S.C. 92, 93 n.2, 610 S.E.2d 858, 859 n.2 (Ct. App. 2005); *see also Wierszewski v. Tokarick*, 308 S.C. 441, 444 n.2, 418 S.E.2d 557, 559 n.2 (Ct. App. 1992) (stating that when the respondent failed to file a brief, "it [was] proper to reverse on the points presented rather than to search the record for reasons to affirm").

findings, this court will not overrule those findings. *Stokes v. Metro. Life Ins. Co.*, 351 S.C. 606, 609-10, 571 S.E.2d 711, 713 (Ct. App. 2002).

## LAW/ANALYSIS

### I. Application of the FAA – Interstate Commerce

Weekley argues the circuit court erred in denying its motion to compel arbitration when an enforceable arbitration agreement covered the scope of the claims asserted in this dispute and the agreement explicitly provided that the transaction involved interstate commerce and that the FAA would apply to the resolution of any claim, dispute or cause of action involving the Agreement. We agree.[8]

"'[T]he basic purpose of the [FAA] is to overcome courts' refusals to enforce agreements to arbitrate,' and 'ensure that arbitration will proceed in the event a state law would have a preclusive effect on an otherwise valid arbitration agreement.'" *Dean v. Heritage Healthcare of Ridgeway, LLC*, 408 S.C. 371, 379, 759 S.E.2d 727, 731 (2014) (alteration by court) (first quoting *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 270 (1995), then quoting *Bradley*, 398 S.C. at 453, 730 S.E.2d at 315). Accordingly, "unless the parties specifically contracted otherwise, the FAA . . . appl[ies] whenever an arbitration agreement involves interstate commerce." *Id.* "[T]he reach of interstate commerce—and thus the FAA—was coextensive with the broad reach of the Commerce Clause." *Id.* "Thus, in practice, arbitration agreements enjoy a strong presumption of validity in federal and state courts." *Id.* at 380, 759 S.E.2d at 731-32.

"To ascertain whether an arbitration agreement implicates interstate commerce and the FAA, 'the court must examine the agreement, the complaint, and the surrounding facts,' focusing particularly on 'what the terms of the contract specifically require for performance.'" *Id.* at 380, 759 S.E.2d at 732 (quoting

---

[8] Our supreme court recently determined the inclusion of a provision stating the FAA applies to any disputes arising under a contract would not, in and of itself, be controlling. *See Hicks Unlimited, Inc., v. Unifirst Corp.*, 439 S.C. 623, 630, 889 S.E.2d 564, 567 (2023) (finding parties may not "agree—preemptively—that a court may apply the FAA's federal preemption power to their contract without first peeking behind the curtain to ensure interstate commerce is involved"). Nevertheless, in this case, because we conclude the Agreement involved interstate commerce, as discussed *infra*, the FAA is controlling.

*Bradley*, 398 S.C. at 455, 730 S.E.2d at 316). "This is generally a very fact-specific inquiry." *Id.*

"[I]n determining whether the FAA applies to a particular arbitration agreement, a court considers whether the contract concerns a transaction involving interstate commerce." *Cape Romain Contractors, Inc. v. Wando E., LLC*, 405 S.C. 115, 122, 747 S.E.2d 461, 464 (2013). "Under the reach of the Commerce Clause, 'Congress has authority to regulate (1) "the use of the *channels* of interstate commerce," (2) "the *instrumentalities* of interstate commerce, or persons or things in interstate commerce . . ." and (3) "those activities having a *substantial relation* to interstate commerce."'" *Id.* (quoting *United States v. Gould,* 568 F.3d 459, 470 (4th Cir. 2009)). "Channels of commerce are 'the interstate transportation routes through which persons and goods move.'" *Id.* (quoting *United States v. Ballinger*, 395 F.3d 1218, 1225 (11th Cir. 2005) (quoting *United States v. Morrison*, 529 U.S. 598, 613 n.5 (2000) (noting channels of interstate commerce include highways, railroads, navigable waterways, airspace, telecommunications networks and even national securities markets))). "Instrumentalities of interstate commerce, by contrast, are the people and things themselves moving in commerce . . . ." *Id.* (quoting *Ballinger*, 395 F.3d at 1226 (identifying automobiles, airplanes, boats, shipments of goods, pagers, telephones and mobile phones as instrumentalities of interstate commerce)).

The Dixons argued the Agreement was for the sale of real estate, not for the construction of a home or for custom elements contained therein. They argued *Bradley v. Brentwood Homes* stated a purchase sale agreement was an intrastate transaction, not an interstate transaction, therefore did not involve federal preemption by the FAA.

In *Bradley*, the court explained the contract was not for the construction of a home, but an already complete home, noting "the Home Purchase Agreement specifically provides that Bradley agreed to purchase a completed dwelling rather than contract for the construction of a dwelling. Notably, the provisions of the Agreement providing for 'New Construction,' 'House Plan,' 'Options,' and 'Color Selection,' are eliminated as 'N/A' and were not signed by Bradley." 398 S.C. at 458, 730 S.E.2d at 318. The court found the affidavit of Brentwood Homes' representative was "inapposite as his attestation that out-of-state materials, suppliers, and subcontractors were used for the construction of the residence has no bearing on the purchase of the completed dwelling." *Id.* The court determined that "[b]ecause the essential character of the Agreement was strictly for the purchase of a completed residential dwelling and not the construction, . . . the FAA does not

apply as these types of transactions have historically been deemed to involve intrastate commerce." *Id*. at 459, 730 S.E.2d at 318. However, the court clarified "had the Agreement actually encompassed the construction of the residence, it would have been subject to the FAA as our appellate courts have consistently recognized that contracts for construction are governed by the FAA." *Id*. at 458 n.8, 730 S.E.2d at 318 n.8

In *Damico*, the homeowners argued the contracts did not involve interstate commerce and therefore, the builder could not compel the homeowner to arbitrate under federal law (the FAA). *Damico v. Lennar Carolinas, LLC*, 437 S.C. 596, 608, 879 S.E.2d 746, 753 (2022). The supreme court disagreed, finding, "[t]he transactions here manifestly involve interstate commerce, as they involved the construction of new homes built to Petitioners' specifications rather than the purchase of pre-existing homes." *Id.* (citing *Bradley*, 398 S.C. at 458 n.8, 730 S.E.2d at 318 n.8 ("[O]ur appellate courts have consistently recognized that contracts for construction are governed by the FAA."); *Episcopal Hous. Corp. v. Fed. Ins. Co.*, 269 S.C. 631, 640, 239 S.E.2d 647, 652 (1977) (explaining that contracts requiring the construction of a new building implicate interstate commerce because it would be "virtually impossible" to construct the building "with materials, equipment[,] and supplies all produced and manufactured solely within the State of South Carolina").

In this case, contrary to the Dixons' position, the language of the Agreement and the record demonstrates the Agreement was not for the purchase of a completed home but involved at a minimum the completion of custom elements in the home which fall within the parameters of construction. A checklist accompanying the Agreement suggests the Pattees had been able to select options for flooring, appliance color, bath hardware, countertops, plumbing fixtures, shower enclosures, interior and exterior hardware, lighting style, interior paint, and backsplash and wall tile. Provision 12 of the Agreement, titled ADDITIONAL PROVISIONS, designates specific directions for the additional laying of hardwood floor, the extension of crown molding, the replacement of laminate countertops with quartz, and the installation of specified sinks and faucets. The records submitted by Burchfield as exhibits to his affidavit show that the Pattees made $15,275 worth of customizations, and Dupree's affidavit attested to shingles, appliances, hardwood flooring, countertops, sinks, faucets and crown molding being purchased outside of South Carolina.

Neither the Dixons nor the Pattees have provided any evidence to support their contention that the contract between the Pattees and Weekley was to purchase a

fully-constructed home.  They did not provide any affidavits or records in support; merely, their attorneys' arguments that based on when the permits were issued, the home had to have already had been completed.[9]  Weekley provided evidence in the form of affidavits and the Agreement itself that the transaction here did not involve the sale of a completed home and did involve interstate commerce.  Consequently, we conclude the FAA did apply.

## II.    The Pattees' Claims against Weekley

Weekley contends the circuit court erred in denying a motion to compel arbitration with respect to the Pattees' claim against Weekley, because the Pattees' claim falls within the scope of the arbitration provisions, and it is undisputed that the agreement is enforceable.  We agree.

A claim for equitable indemnity may arise when "a first party is liable to pay a second party for a loss or damage the second party incurs to a third party."  *Rock Hill Tel. Co. v. Globe Commc'ns, Inc.,* 363 S.C. 385, 389, 611 S.E.2d 235, 237 (2005) (quoting *First Gen. Servs. of Charleston, Inc. v. Miller,* 314 S.C. 439, 442, 445 S.E.2d 446, 449 (1994)).  "The right to indemnity arises by operation of law 'in cases of imputed fault or where some special relationship exists between the first and second parties.'" *Id.* (quoting *First Gen. Servs. of Charleston, Inc.,* 314 at 442, 445 S.E.2d at 449).  A claim for indemnification "exists whenever the relation between the parties is such that either in law or in equity there is an obligation on one party to indemnify the other, as where one person is exposed to liability by the wrongful act of another in which he does not join." *Id. (quoting Stuck v. Pioneer Logging Mach., Inc.,* 279 S.C. 22, 24, 301 S.E.2d 552, 553 (1983)).

In the instant case, the Pattees allege any damages they suffer as a result of the Dixons' claims against them should be paid by Weekley because Weekley defectively constructed the home.

The Pattees initialed every page of the Agreement, including those containing the arbitration provisions, fully executed the signature page of the Agreement and acknowledged receipt of a sample of the Home Warranty which contained the relevant Warranty arbitration provisions.  The Pattees have not asserted any basis for avoiding the arbitration agreements contained in the Agreement and Warranty,

---

[9] No permits are included in the Record.  In its answer to the Dixon's complaint, Weekley admitted "it obtained a permit during 2007 [and] denie[d] a permit was obtained in 2008"

other than their assertion the FAA does not apply, which we have resolved against them. Furthermore, the Pattees have not disputed that their claim against Weekley for equitable indemnification is within the scope of the arbitration agreements contained in the Agreement and Warranty. Even if there were some doubt as to the scope or applicability of the relevant arbitration agreements, such doubts are resolved in favor of arbitration given the FAA's liberal federal policy favoring arbitration agreements. *See Landers v. Fed. Deposit Ins. Corp.*, 402 S.C. 100, 109, 739 S.E.2d 209, 213 (2013) ("A clause which provides for arbitration of all disputes 'arising out of or relating to' the contract is construed broadly."). In this case, the claim for equitable indemnification arises from the construction of the home and the Pattees relied on the Agreement to assert a special relationship between themselves and Weekley as purchaser and seller. For all the foregoing reasons, we conclude the Pattees' claims are subject to arbitration pursuant to the FAA.

## III. The Dixons' Claims

Weekley contends the circuit court erred in denying its motion to compel arbitration with respect to the Dixons' claims because their causes of action are dependent upon the agreements that require arbitration and are within the scope of the arbitration agreements. We agree.

"Generally, arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Pearson v. Hilton Head Hosp.*, 400 S.C. 281, 288, 733 S.E.2d 597, 600 (Ct. App. 2012) (quoting *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 416 (4th Cir. 2000)). "[T]he presumption in favor of arbitration applies to the scope of an arbitration agreement; it does not apply to the existence of such an agreement *or to the identity of the parties who may be bound* to such an agreement." *Wilson v. Willis*, 426 S.C. 326, 337, 827 S.E.2d 167, 173 (2019) (quoting *Carr v. Main Carr Dev., LLC*, 337 S.W.3d 489, 496 (Tex. App. 2011) (emphasis added)). "Even the exceptionally strong policy favoring arbitration cannot justify requiring litigants to forego a judicial remedy when they have not agreed to do so." *Id.* (quoting *Carr*, 337 S.W.3d at 496). "Moreover, because arbitration, while favored, exists solely by agreement of the parties, a presumption *against* arbitration arises where the party resisting arbitration is a nonsignatory to the written agreement to arbitrate." *Id.* at 337-38, 827 S.E.2d at 173. "Whether an arbitration agreement may be enforced against nonsignatories, and under what circumstances, is an issue controlled by state law." *Id.* at 338, 827 S.E.2d at 173-74.

"Well-established common law principles dictate that in an appropriate case a nonsignatory can enforce, or be bound by, an arbitration provision within a contract executed by other parties." *Pearson*, 400 S.C. at 288, 733 S.E.2d at 600 (quoting *Int'l Paper Co.,* 206 F.3d at 416-17). "South Carolina has recognized several theories that could bind nonsignatories to arbitration agreements under general principles of contract and agency law, including (1) incorporation by reference, (2) assumption, (3) agency, (4) veil piercing/alter ego, and (5) estoppel." *Wilson*, 426 S.C. at 338, 827 S.E.2d at 174.

"[A] party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has *consistently maintained that other provisions of the same contract should be enforced to benefit him.*" *Id.* (quoting *Int'l Paper Co.*, 206 F.3d at 418) (emphasis added by court). "To allow [a plaintiff] to claim the benefit of the contract and simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying enactment of the Arbitration Act." *Pearson,* 400 S.C. at 290, 733 S.E.2d at 601 (alteration in original) (quoting *Int'l Paper Co.*, 206 F.3d at 418). When "plaintiffs sue and seek relief based on contracts containing arbitration clauses, courts have applied equitable estoppel." *Wilson*, 426 S.C. at 344, 827 S.E.2d at 177 (citing *Int'l Paper Co.*, 206 F.3d at 417-18 (applying equitable estoppel and holding the nonsignatory plaintiff could not bring claims to enforce the guarantees and warranties issued by the defendant in a contract with another party without complying with an arbitration provision contained in that contract)).

"A nonsignatory is estopped from refusing to comply with an arbitration clause when it receives a direct benefit from a contract containing an arbitration clause." *Pearson*, 400 S.C. at 290, 733 S.E.2d at 601 (internal quotation omitted) (quoting *Int'l Paper Co.*, 206 F.3d at 418). "[A] nonsignatory cannot be bound without receiving a direct benefit from or pursuing a claim . . . integrally related to the contract containing the arbitration clause." *Id.* at 291, 733 S.E.2d at 602 (internal quotation omitted) (quoting *Int'l Paper Co.*, 206 F.3d at 418 n.6). In *International Paper*, the Fourth Circuit found International Paper, the purchaser of a saw manufactured by Schwabedissen and distributed by Wood Systems, sought a direct benefit from the agreement between the manufacturer and distributor and made a claim integrally related to that agreement when it sued Schwabedissen for breach of the terms and warranties contained therein. 206 F.2d at 414-18. Consequently, International Paper was estopped from contesting the arbitration agreement in the contract. *Id.* at 418.

"[A] party may not rely on the contract when it works to its advantage, and repudiate it when it works to its disadvantage." *Pearson*, 400 S.C. at 295, 733 S.E.2d at 604 (internal quotation omitted) (quoting *Jackson v. Iris.com*, 524 F. Supp. 2d 742, 749). "When 'a signatory seeks to enforce an arbitration agreement against a non-signatory, the doctrine estops the non-signatory from claiming that he is not bound to the arbitration agreement when he receives a "direct benefit" from a contract containing an arbitration clause.'" *Id.* (quoting at *Jackson*, 524 F. Supp. 2d at 749-50).

> When a claim depends on the contract's existence and cannot stand independently—that is, the alleged liability "arises solely from the contract or must be determined by reference to it"—equity prevents a person from avoiding the arbitration clause that was part of that agreement. But "when the substance of the claim arises from general obligations imposed by state law, including statutes, torts and other common law duties, or federal law," direct-benefits estoppel is not implicated even if the claim refers to or relates to the contract *or would not have arisen "but for" the contract's existence*.

*Wilson*, 426 S.C. at 343, 827 S.E.2d at 176 (emphasis added by court) (quoting *Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 637 (Tex. 2018).

The arbitration provisions contained in the Agreement and Warranty are enforceable against the Dixons because, while they are not parties or signatories to the relevant agreements, the Dixons expressly rely on the Agreement and Warranty in alleging their breach of warranty claim against Weekley. The second amended complaint states "Weekley impliedly and/or *expressly warranted* that the design, building, construction, and materials would be performed using the utmost skill and attention and would be of good and workmanlike quality. Further, Weekley impliedly and/or *expressly warranted* that the design, building, construction, and materials would be such that the Subject Residence would be habitable and fit for its intended use as a single-family residence." (emphasis added). They cannot therefore repudiate the arbitration provisions contained therein on the basis of being nonsignatories.

With regard to the SCUTPA claim, the Dixons' reliance on the Agreement or Warranty is not as clear. However, they fail to address in their respondents' brief Weekley's argument that the claim is subject to arbitration. *See First Union Nat'l*

*Bank v. FCVS Communications,* 321 S.C. 496, 502, 469 S.E.2d 613, 617 (Ct. App. 1996) (noting if respondent fails to answer to an issue in his brief, the appellate court may treat the failure to respond as a confession that the appellant's position is correct). Consequently, we conclude the Dixons' claims are subject to arbitration.

## IV.   The Dixons' Additional Arguments (Additional Sustaining Grounds)[10]

The Dixons raise two additional sustaining grounds on appeal— violation of the SCUAA and unconscionability.

> [A] respondent . . . may raise on appeal any additional reasons the appellate court should affirm the lower court's ruling, regardless of whether those reasons have been presented to or ruled on by the lower court. It would be inefficient and pointless to require a respondent to return to the judge and ask for a ruling on other arguments to preserve them for appellate review. It also could violate the principle that a court usually should refrain from deciding unnecessary questions.

*I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 419, 526 S.E.2d 716, 723 (2000). However, "an appellate court is less likely to rely on such a ground when

---

[10] Because the circuit court issued a Form 4 order with no findings and did not make any indication of findings at the hearing, we do not know on what ground the circuit court denied the motion to compel arbitration. This court has recently reiterated that a circuit court is allowed to issue a Form 4 order when ruling on a motion to dismiss. *See Santos v. Harris Inv. Holdings, LLC*, 439 S.C. 214, 219, 886 S.E.2d 483, 485 (Ct. App. 2023) (citing to the language of Rule 52(a), SCRCP which provides "[f]indings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in Rule 41(b)" and concluding the circuit court properly acted within its discretion when granting a motion to dismiss via Form 4 order); *see also Borg Warner Acceptance Corp. v. Darby*, 296 S.C. 275, 279, 372 S.E.2d 99, 101-02 (Ct. App. 1988) (holding Rule 52(a)'s requirement that a court in an action tried without a jury "find the facts specially and state separately its conclusions of law thereon" was "merely directory and provide[d] no basis for invalidating a judgment").

the respondent has failed to present it to the lower court." *Id.* at 421, 526 S.E.2d at 724. "An appellate court may not rely on Rule 220(c), SCACR, . . . when the court believes it would be unwise or unjust to do so in a particular case. It is within the appellate court's discretion whether to address any additional sustaining grounds." *Id.* at 420, 526 S.E.2d at 723.

"While a respondent may raise on appeal any additional sustaining grounds appearing in the record, even where those reasons have not been ruled on by the lower court, we are reticent to invoke an alternative sustaining ground where the ground is not raised in the appellate brief." *Alexander v. Houston*, 403 S.C. 615, 620 n.4, 744 S.E.2d 517, 520 n.4 (2013). "Invoking an additional sustaining ground under such circumstances would generally be unfair to an unaware appellant." *Id.*

With regard to unconscionability, the *Pattees* mentioned the issue at the circuit court hearing in reference to the *D.R. Horton* case, but the Dixons did not argue unconscionability in front of the circuit court. However, because this case involves the possibility of enforcing an unconscionable arbitration agreement, we will consider it as an additional sustaining ground.

### A. SCUAA

The Dixons argue the arbitration provision is unenforceable under the SCUAA.[11] They contend the notice contained in the Agreement does not comply with section 15-48-10(a) because (1) it is neither typewritten nor stamped; (2) it is not underlined; (3) and it is not displayed on the first page of the document. They maintain these technical failures—both individually and collectively—preclude enforcement of arbitration under South Carolina law. We decline to address this additional sustaining ground because even if the Agreement violates the SCUAA requirements, our decision that the FAA is controlling is dispositive. *See Zabinski*, 346 S.C. at 592, 553 S.E.2d at 116. ("While the parties may agree to enforce arbitration agreements under state rules rather than FAA rules, the FAA will preempt any state law that completely invalidates the parties' agreement to arbitrate."); *Bradley*, 398 S.C. at 453, 730 S.E.2d at 315 (finding the builder's concession the contract violated the SCUAA was not dispositive because even though "an application of the South Carolina law would have rendered the parties' arbitration agreement completely unenforceable, consideration of the applicability of the FAA is required" and "[t]he FAA is intended to ensure that arbitration will

---

[11] S.C. Code Ann. §§ 15-48-10 to -240.

proceed in the event a state law would have preclusive effect on an otherwise valid arbitration agreement").

## B. Unconscionability

The Dixons also assert the arbitration provision is unconscionable. They contend the Agreement is an adhesion contract, and the Pattees, and by extension the Dixons, had little-to-no bargaining power. We conclude this issue is abandoned on appeal. [12]

The Dixons correctly point out that the beginning point of an unconscionability analysis is whether the complaining party had a meaningful choice in consenting to the terms of the agreement or whether it was a contract of adhesion. "The touchstone of the [unconscionability] analysis begins with the presence or absence of meaningful choice." *Damico* at 612, 879 S.E.2d at 755. "[A] party seeking to prove an arbitration agreement is unconscionable must allege he lacked a meaningful choice as to the arbitration clause specifically, not merely that he lacked a meaningful choice as to the contract as a whole." *Id.* at 613, 879 S.E.2d at 755. "Whether one party lacks a meaningful choice . . . typically speaks to the fundamental fairness of the bargaining process." *Id.* (quoting *D.R. Horton*, 417 S.C. at 49, 790 S.E.2d at 4. "[I]n determining whether an absence of meaningful choice taints a contract term, . . . courts must consider, among all facts and circumstances, the relative disparity in the parties' bargaining power, the parties' relative sophistication, and whether the plaintiffs are a substantial business concern of the defendant." *Id.*

"Parties frequently claim they lack a meaningful choice when a contract of adhesion is involved." *Id.* at 613, 879 S.E.2d at 756. "[A]dhesion contracts are 'standard form contracts offered on a take-it or leave-it basis with terms that are not negotiable.'" *Id.* (quoting *D.R. Horton*, 417 S.C. at 49, 790 S.E.2d at 4). "Because contracts of adhesion are non-negotiable, '[a]n offeree faced with such a contract has two choices: complete adherence or outright rejection.'" *Id.* (quoting *Lackey v. Green Tree Fin. Corp.*, 330 S.C. 388, 394, 498 S.E.2d 898, 901 (Ct. App. 1998)

---

[12] The Agreement also contains a severability provision. However, because we do not find the arbitration provisions unconscionable, we need not address that issue. *See Whiteside v. Cherokee County School Dist. No. One,* 311 S.C. 335, 340, 428 S.E.2d 886, 889 (1993) (appellate court need not address remaining issues when disposition of prior issue is dispositive).

(citation omitted). Although "[a]dhesion contracts are not per se unconscionable," courts view them with "considerable skepticism," as it is doubtful the parties had a true agreement to submit disputes to arbitration, due to one party having virtually no input in the terms and language. *Id.*

"[A]dhesive contracts are not unconscionable in and of themselves so long as the terms are even-handed." *Id.* at 614, 879 S.E.2d at 756 (emphasis omitted). "[U]nconscionability requires a finding of a lack of meaningful choice *coupled with* unreasonably oppressive terms. Thus, an adhesion contract with fair terms is certainly not unconscionable, and the mere fact a contract is one of adhesion does not doom the contract-drafter's case." *Id.* The supreme court has "taken judicial cognizance of the fact that a modern buyer of new residential housing is normally in an unequal bargaining position as against the seller." *D.R. Horton, Inc.*, 417 S.C. at 50, 790 S.E.2d at 4 (citing *Sapp v. Ford Motor Co.*, 386 S.C. 143, 147-48, 687 S.E.2d 47, 49-50 (stating that South Carolina's "courts have shifted from following the doctrine of *caveat emptor* ('let the buyer beware') to the doctrine of *caveat venditor* ('let the seller beware')")).

As noted in the caselaw above, the second part of the unconscionability analysis involves determining whether the terms of the agreement are so one-sided and oppressive that no reasonable person would accept them. The Dixons' argument focuses solely on the Agreement as being a contract of adhesion. They cite to no authority or specific provisions in the Agreement or Warranty that are oppressive or one-sided. As a result, we find their unconscionability argument is not preserved for our consideration as a critical portion of the analysis is only referred in a conclusory fashion and is unsupported by authority. *See Equivest Fin., LLC v. Ravenel*, 422 S.C. 499, 506, 812 S.E.2d 438, 441 (Ct. App. 2018) ("When a party provides no legal authority regarding a particular argument, the argument is abandoned and the court will not address the merits of the issue."); *Glasscock, Inc. v. U.S. Fid. & Guar. Co.*, 348 S.C. 76, 81, 557 S.E.2d 689, 691 (Ct. App. 2001) ("[S]hort, conclusory statements made without supporting authority are deemed abandoned on appeal and therefore not presented for review.").

**CONCLUSION**

Based on all of the foregoing, the decision of the circuit court denying Weekley's motion to compel arbitration is

**REVERSED.**

**VINSON, J., and LOCKEMY, A.J., concur.**